Decided 11 January, 1904.

## STATE *v.* GRAY.

[ 74 Pac. 927.]

CRIMINAL LAW — ADMISSIBILITY OF DYING DECLARATIONS.*

1. It is not necessary that an injured person have expressed a belief in the near
presence of death to render his statements competent as dying declarations, as
his condition of mind may be quite apparent from his conduct. For instance,

*NOTE.—The question, What Declarations are Admissible as Dying Declara-
tions, and in What Cases, is considered in an article in 86 Am. St. Rep. pp. 637–667;
and Dying Declarations as Evidence is the subject of a note in 56 L. R. A. pp. 353–
457.—REPORTER.

where a person who had been shot in an altercation was aware that his injuries were very severe, and had been informed by the attending surgeon that he necessarily had to die of his wounds, and that a statement by him would probably be serviceable in clearing up the matter, a corrected and signed written statement is competent evidence as a dying declaration, though the signer did not orally express his belief in impending death.

IMPEACHMENT OF WITNESS.

2. On cross-examination of a witness she was asked if, under given circumstances, she had not made a certain statement to a certain person, which she denied. The certain person, having been asked whether such statement had been made, answered "Yes, would answer part of that," but, after being required to answer explicitly, said "Yes." On cross-examination she explained the conversation, which differed materially from the version given by the first witness, yet contradicted it in some respects. *Held*, that the impeaching testimony was competent.

UNDERSTANDING OF IMPEACHING QUESTION BY WITNESS.

3. An impeaching question is sufficient if it attracts the attention of witness to the particular statement or act about which he is being asked, and greater particularity than will accomplish this is not required.

SELF-DEFENSE†—REPELLING UNARMED ATTACK.

4. In repelling an unprovoked attack the party assailed may act upon the reasonable appearances of the situation, though the assailant may not have been armed. Sometimes an unarmed attack may justify a killing in self-defense.

†NOTE.—In 74 Am. St. Rep. pp. 717-740 is a carefully arranged and exhaustive note on The Law of Self-defense. See, also, note, Right of Self-defense, in 6 L. R. A. 424, and an extended discussion of the subject in 45 L. R. A. 687, under the title, Self-defense set up by Accused who Began the Conflict.—REPORTER.

From Union : ROBERT EAKIN, Judge.

Woodson Gray appeals from a conviction of manslaughter.    REVERSED.

For appellant there was a brief and an oral argument by *Mr. Thos. H. Crawford* and *Mr. J. D. Slater.*

For the state there was a brief over the names of *Andrew M. Crawford*, Attorney General, and *Samuel White*, District Attorney, with an oral argument by *Mr. Crawford.*

MR. JUSTICE WOLVERTON delivered the opinion.

The defendants Woodson and Wade Gray were jointly accused by indictment of the crime of murder in the first degree for killing one A. M. Hallgarth on March 20, 1903; and, being tried, the former was convicted of manslaughter, and the latter acquitted. This appeal is from the judgment following conviction.

On the morning of the day indicated, the defendants were passing Hallgarth's premises on foot upon the public highway, and, being hailed by the latter, who was in his field, south of the road, halted for him to come up. As he approached, a conversation sprung up relative to some difficulty with Gray's children at school, which became animated and heated; and Hallgarth, becoming angered and enraged, jumped over the fence into the road, removed his coat, and advanced toward the defendant Woodson Gray in a threatening attitude, expressing, as the evidence tends to show, his purpose of settling the difficulty then and there, when Gray drew his pistol with his left hand (being left-handed), and warned Hallgarth to desist, and that, if he did not, it would be at the peril of his getting hurt. Hallgarth paid no heed to the warning, but continued to advance upon Gray, cursing him, and threatening to take his gun from him and beat his brains out with it, and, when he came within reach, violently seized the gun, and attempted to wrench it from Gray's hand. A scuffle ensued, in the course of which four shots were fired; one of them taking effect upon Hallgarth, entered his body upon the right side two or three inches below the armpit, in the sixth interspace, ranging forward and downward, penetrating the lung, the right lobe of the liver, and a part of the bowel, and passing out through the tissues and muscles of the stomach. During the affray, and, when Gray was about to be overcome, he called upon his son to take his knife and defend him, whereupon the son assailed Hallgarth; inflicting six wounds upon his person, in the back and shoulder, some of them slight, others more severe, but none necessarily fatal.

Gray testified that as Hallgarth advanced upon him he backed off several steps, but that Hallgarth continued to advance, cursing and threatening to kill him, until he came within striking distance, when he jumped and struck

him on the left side of the head, knocking him down, grabbing for the gun at the same time; that, as defendant was falling, or as he struck the ground, he fired the first shot, and thereafter fired two or three others, but thought it was the first shot that took effect, and that Hallgarth wrenched the gun out of his hand, and attempted to shoot him with it, but, in the excitement, his finger was pulling on the guard instead of the trigger. Hallgarth stated that when he got close enough to Gray to grab his arm in the hand of which he held the revolver, but before getting hold of it, Gray shot him. He further stated that Gray fired two or three more shots at him in close succession before he was able to take the revolver from him; that he got him down by throwing him over, not by knocking him down; that he did not hit him at any time; and that while he had him down, securing the revolver, Gray called upon his son to take his knife and kill the declarant. Hallgarth made a statement to Dr. Whiting about 6 o'clock of the evening of the day of the altercation, which the latter reduced to writing, and the former signed after it had been read over to him several times. This statement was introduced by the State, and admitted in evidence, over the objection of defendant, as the dying declaration of Hallgarth; and the action of the court in that regard constitutes the first assignment of error.

1. Dr. Whiting testified that he attended Hallgarth in the morning and evening of the 20th, and again the next day in the morning, and that he died in the evening; that he found him in bed, in a condition of extreme collapse, and, after detailing the nature of the several wounds inflicted, stated that the direct cause of his death was the bullet wound; that the knife wounds contributed to the shock upon his system, but were not fatal, nor the proximate cause of death. He further testified that, before Hallgarth

43 *Or.—29*

made the statement (using the language of the witness),
"I told him I thought he was going to die, that he neces-
sarily had to die, and that probably a statement would be
of some service in clearing up the matter in court; and
he gave me that statement." The basis of the objection
to the admission of his declarations is that they were not
shown to have been made under a sense of impending
death. It will be perceived that deceased made no express
or direct statement indicating that he was conscious of the
fatality of the injuries received, or of his near approach to
dissolution; and all there is from which the state of his
mind upon the subject may be inferred is the suggestion
just related of his physician, made to him, his action in
response thereto in making and signing the declarations,
and the circumstances and conditions leading up to them.
Was this sufficient to justify their admission as evidence
in the case? Two conditions must exist to render dying
declarations admissible: (1) The declarant must have been
*in extremis*; and (2) they must have been made in the
conscious belief that death was impending, and without
hope or expectation of recovery. The latter condition is
purely one of the mind, and must be ascertained and de-
termined by what was said and done in relation to the dec-
larations, and by all the facts and circumstances leading
up to and attending their utterance. It may be, and
usually is, evidenced by verbal expressions of the declarant
indicating with more or less directness his belief in the
near and sure approach of dissolution; but it is not essen-
tial that he should have made any statement or given ut-
terance in language expressive of his present frame of
mind in that relation, for it may be inferred from his con-
duct and deportment, his apparent condition, involving
the nature and extent of the wounds inflicted, being ob-
viously such that he must have felt and known that he
could not survive, and the communications made to him,

if any, especially by his medical advisers, if assented to or
understandingly acquiesced in by him.

As was said by Mr. Justice BEAN in *State* v. *Fletcher*, 24
Or. 295, 297 (33 Pac. 575, 576): "It is not necessary to prove
the existence of such belief by any express statements of
the deceased, but it may be inferred from all the circum-
stances." And, quoting from Greenleaf on Evidence (vol-
ume 1, § 158), he continues: "It is enough if it satisfac-
torily appear in any mode that they were made under that
sanction, whether it be directly proven by the express lan-
guage of the declarant, or be inferred from his evident
danger, or the opinion of the medical or other attendants
stated to him, or from his conduct or other circumstances
of the case, all of which are resorted to in order to ascer-
tain the state of the declarant's mind." See, also, *People*
v. *Simpson*, 48 Mich. 474, (12 N. W. 662); *Peoples* v. *Com-
monwealth*, 87 Ky. 487 (9 S. W. 509, 810). *Regina* v. *Per-
kins*, 9 C. & P. 395, is a case very near to this. The de-
clarant was mortally wounded by a gunshot on one day,
and died the next. In the evening of the day he received
the injury, he was told by the attending physicians that
in all probability he would not recover — that the effects
of the injury would most likely kill him — to which he
made no reply, either expressing assent or dissent, but ap-
peared distressed and dejected ; and it was held that a state-
ment made by him at the time was admissible. So, also,
is *Mattox* v. *United States*, 146 U. S. 140 (13 Sup. Ct. 50).
The person injured asked the opinion of the attending
physician as to the probability of his recovery, who made
reply that the chances were all against him, and that he
did not think there was any show for him at all ; and, with-
out other indication of the state of his mind upon the sub-
ject, he made the declarations or statement objected to,
and it was held competent to go to the jury. Other cases
of marked analogy are *Westbrook* v. *People*, 126 Ill. 81 (18

N. E. 304); *Commonwealth* v. *Matthews*, 89 Ky. 287 (12 S. W. 333). In the case at bar the injuries of Hallgarth were very grave, of which he was unquestionably fully aware; and, on being informed by Dr. Whiting that he necessarily had to die, and that a statement from him would probably be of some service in clearing up the matter in the court, he responded by making it. Evidence of his sense of impending dissolution, without hope of surviving his inflictions, could scarcely be made stronger by a direct affirmation by him to that effect. The statement was properly admitted.

2. The next question relates to the withdrawal from the jury by the court of certain testimony given by Mrs. Wade, intended for the impeachment of Mrs. Hallgarth, a witness for the State. While Mrs. Hallgarth was under cross-examination, she was asked if she had not made a certain statement to Mrs. Wade, recalling it, with the circumstances of time, place, and persons present, which she denied. Mrs. Wade, on being asked whether or nor she made such a statement to her, answered, " Yes, would answer part of that; don't know hardly —" but, when she was told that she must answer either " Yes" or " No," answered " Yes." On cross-examination, however, she gave her version of the statement, differing materially in some respects from that related to Mrs. Hallgarth and repeated to witness, but in other respects corresponding thereto, and tending in some manner to her impeachment. If Mrs. Wade had answered " No," that would have been the end of the inquiry; but, having answered " Yes," which would have been a positive contradiction of Mrs. Hallgarth, the defendant had a right to cross-examine her as to her recollection of the conversation. In this manner it was developed that there was a disagreement between her understanding of the conversation and that of counsel who propounded the impeaching question, which had a tendency to modify the extent of the contradiction, but not eliminate it entirely

or in all material respects; and hence we are of the opinion that the defendant was entitled to have the testimony of the witness upon the subject go to the jury.

3. For the purpose of laying a foundation for the further impeachment of Mrs. Hallgarth, she was asked on cross-examination if she did not make a certain statement to E. B. Moorelock, the witness and she " being alone present;" the examiner designating also the other circumstances of time and place. She remembered distinctly seeing Mr. Moorelock at the time and place designated, but denied absolutely that she made the statement attributed to her. Moorelock, being placed on the witness stand, recalled the conversation alluded to, but stated that other persons were present, to wit, Mrs. Hallgarth's daughter and Mrs. Hazewood; and for this difference from that indicated by the question propounded to Mrs. Hallgarth as to the persons present, if we are rightly informed, the court would not permit him to answer as to whether such a conversation took place or not. This we think was error. It is the purpose of the statute (B. & C. Comp. § 853), in requiring the supposed inconsistent statement to be related to the witness whom it is desired to impeach, with the circumstances of time, place, and persons present, to call such especial attention to it that the witness may not mistake the one in the mind of the examiner, and to which reference is had; and, when this is done, it is sufficient: *Sheppard* v. *Yocum*, 10 Or. 402; *State* v. *Ellsworth*, 30 Or. 145 (47 Pac. 199); *State* v. *Bartmess*, 33 Or. 110 (54 Pac. 167); *State* v. *Deal*, 41 Or. 437 (70 Pac. 532). It appears from the record that Mrs. Hallgarth readily understood from the especial circumstances related to her when the conversation should have taken place, if at all, and was enabled to answer intelligently at once upon the subject, so that the purpose of the statute had been fully subserved.

4. The next assignment of error relates to an instruction given and another refused by the court. That given is in language as follows:

"But such right of self-defense as will justify the taking of life of the assailant can only be exercised to defend his life or defend his person from great bodily harm. But danger of a battery alone will not be sufficient to justify the taking of the life of his assailant."

The one refused is as follows: "It is not necessary that the assault made by the deceased at the time upon the defendant Woodson Gray, if you find that an assault was made, should have been made with a deadly weapon. An assault with the fist alone, if there was an apparent purpose and the ability to inflict death or serious bodily injury by the deceased upon the defendant Woodson Gray, is sufficient to justify the killing in self-defense, if the defendant Woodson Gray, at the time he shot and killed the deceased, had reason to believe, and did believe, that he was in imminent danger of death or great bodily harm at the hands of the deceased."

There was evidence tending to show that the deceased was a blacksmith by trade, in the prime of life, weighing from 180 to 190 pounds, and a vigorous and powerful man; while the defendant Woodson Gray, although a large man also, was fifty-seven years of age and impaired in health. We are impressed that the instruction requested, under all the facts and circumstances developed by the testimony, was a fitting and suitable complement to the one given. We have carefully examined all the other instructions given, and they contain none which is the equivalent of the one refused. A mere assault, or the danger of a battery alone, without any real or apparent danger to life or limb, or the infliction of great bodily harm, will not, it is true, justify the taking of human life. In such a case the assailed may withstand the attack and meet force with force, but not kill his assailant. The law does not require that he, being in a place where he has a lawful right to be,

and not being, himself the aggressor, shall retreat to the wall, but it is his duty to retreat or otherwise avoid further conflict if he can reasonably do so without danger to his life or subjecting himself to great bodily harm, rather than take the life of his aggressor; that is to say, retreat or avoidance of further conflict to prevent the taking of human life is only required where the assault is not accompanied with imminent danger to life or great bodily injury, real or apparent. Where, however, the assault is attended with such demonstration, and the present ability to execute it, whether the assailant is armed with a deadly weapon or not, as to indicate to the assailed, acting reasonably upon appearances, that he is in imminent danger of being beaten and maltreated, and probably disfigured or maimed, or his life imperiled, he has a right to withstand the assault, even to the taking of the life of the aggressor.

No person has a right to advance into a public highway and administer a merciless castigation upon his neighbor who is lawfully there; nor does the law require that a person, when so assailed, shall stop to inquire to what extremes his aggressor will push the attack, but may act at once upon appearances, and resist it with such force as will effectually repel it. A strong, powerful man, with his fists alone is capable of visiting great physical injury upon his victim much his inferior in strength or endurance, and he may even thus take his life. Instances are not wanting where such results have followed. An assault by a weaker person upon a stronger with the fists, without the physical ability presently apparent to do great injury, could not, it must be conceded, justify the taking of life, and the question as to the degree of danger attending the assault is one for the jury; they putting themselves in the place of the assailed, and acting as reasonable men upon the conditions as they appear to have existed. The present was manifestly a proper case to be submitted to the

jury upon the question of the relative strength and physical ability of the two combatants, and as to whether the defendant, at the time he fired at the deceased, acting from the standpoint of a reasonable man, had reason to believe that he was in imminent peril of great bodily harm or of losing his life. If such was the case, then he was justifiable in doing what he did to prevent the injury to himself. In support of this statement of the law, see *State* v. *Gibson*, 43 Or. 184 (73 Pac. 333); *State* v. *Benham*, 23 Iowa, 154 (92 Am. Dec. 416); *High* v. *State*, 26 Tex. App. 545 (10 S. W. 238, 8 Am. St. Rep. 488); *Commonwealth* v. *Drum*, 58 Pa. 9 ; *State* v. *Sumner*, 55 S. C. 32 (32 S. E. 771, 74 Am. St. Rep. 707, with note at p. 725 *et seq.*); *Davis* v. *State*, 152 Ind. 34 (51 N. E. 928, 71 Am. St. Rep. 322).

The judgment of the circuit court will therefore be reversed, and the cause remanded for such further proceedings as may seem proper, not inconsistent with this opinion.        REVERSED.

Decided 6 July, rehearing denied 3 August, 1903.