[No. 2764. Nov. 17, 1924.]

## STATE v. STEWART.

### SYLLABUS BY THE COURT

1. Ordinarily a general objection to the admission of evidence on the ground that it is immaterial, without more,

raises no question for review on appeal, where the immateriality is not clearly apparent.

2. A "dying declaration" is admissible in evidence only when it is shown that the declarant was conscious of the approach of death at the time the same was made; and, where the only evidence of such consciousness on the part of the declarant is the character of the wound, and the state of his illness, such a declaration cannot be admitted, where all the surrounding facts and circumstances indicate that no such consciousness existed.

3. Ambiguities in a written statement offered as a dying declaration, caused by interlineations made by the writer who prepared it, should be explained, if testimony for that purpose can be procured.

4. The admission in evidence of a dying declaration does not deprive a defendant of any constitutional right.

5. The refusal of the court to permit a witness to answer a question propounded in the trial of the case furnishes no ground for review on appeal, where the question fails to disclose the nature of the evidence sought to be elicited, and the court is not informed what the testimony of the court is expected to be.

6. It is error for the court to exclude preliminary proof, offered for the purpose of showing a similarity of conditions attending an alleged occurrence, and an experiment made to test the truth of testimony relative thereto.

7. Since there was no evidence of flight or concealment, there is no apparent error in the exclusion of testimony as to the defendant's whereabouts prior to his arrest.

8. The admission of testimony, which is subsequently withdrawn, with instructions to the jury not to consider it, furnishes no ground for appeal, in the absence of a motion for a mistrial, where no injury to the rights of the defendant is apparent.

9. It is not error for the court to refuse to permit an unnecessary repetition of testimony.

Appeal from District Court, Dona Ana County; Ed Mechem, Judge.

Wesley Stewart was convicted of murder in the second degree, and he appeals. Reversed and remanded for new trial.

Holt & Sutherland, of Las Cruces, for appellant.

Milton J. Helmick, Atty. Gen., John W. Armstrong, Asst. Atty. Gen., and J. Benson Newell, Dist. Atty., of Alamogordo, for the State.

## OPINION OF THE COURT

FORT, J.  Wesley Stewart was indicted for the murder of G. I. Maloy, which is alleged to have occurred on August 21, 1921, and at the trial was convicted of murder in the second degree, and from this conviction he appeals.

The appellant, Stewart, who will hereafter be referred to as the defendant, had an interest in lands in Dona Ana county, under the Picacho community ditch, the waters of which were distributed under the old community ditch system by a majordomo, who, at the date of the killing, and for some time prior thereto, was the deceased, G. I. Maloy.  There was a difference between the owners of the water rights under this ditch as to the advisability of turning this ditch over to the United States Reclamation Service, and the defendant was the leading spirit of those favoring such change, and Maloy, the majordomo, and McElyea and Denny, the ditch commissioners, were leaders among those who opposed the change.  Considerable ill feeling existed between the two factions and various threats, the one toward the other, were in evidence. The immediate controversy which resulted in the homicide arose from the alleged nonpayment by the defendant of a small disputed ditch assessment, of about $3.  Maloy had threatened to cut off the defendant's water, unless this assessment was paid, and on the morning of August 12th the water was cut off, at his order.  The defendant armed himself with a shotgun loaded with buckshot or BB shot, went to his headgate, opened it, and turned the water into his irrigating ditch, and seated himself nearby with his gun.  Shortly thereafter, Maloy, the majordomo, came across the bridge near the point where the defendant's headgate was situated, and, after some words between them, the defendant shot Maloy at a distance of some 50 or 60 feet, one of the shots entering Maloy's abdomen, and several entered the fleshy part of his thigh. Maloy fell from the mule he was riding, and walked a short distance, falling into some weeds nearby.  The only witness to the shooting were Maloy, J. O. Luther,

and the defendant. The witness Luther, at the time Maloy rode up, was engaged in cleaning out a lateral to the ditch with a shovel, with his back toward the scene of the difficulty, at a distance of approximately 800 feet from the place where Maloy was sitting on the mule, and testified that his attention was attracted by a remark of Maloy, who said to the defendant, "Come out of hiding, Stewart; don't be a damn coward; come and let's talk this thing over," to which some one, whose voice he could not identify, said in a lower tone, "Throw up your hands;" that he heard further talking, but could not distinguish the words, and then heard the report of the gun, but did not see who fired it; that the deceased, at the time of the shot, had his hands on the pommel of the saddle from which he fell. The shooting occurred between 7:30 and 8:30 o'clock in the morning, and Maloy died during the afternoon of the same day. An alleged dying declaration was admitted in evidence, which was in substantial accord with the statement of Luther as to what was said. The testimony of the state further sought to show that upon the approach of Maloy the defendant repaired to a cornfield nearby and concealed himself, from which point he fired the shot.

The defendant denied that he was in the cornfield, but asserted that he was seated on the ditch bank, and his account of what took place was substantially as follows: After he opened his headgate, he seated himself nearby on the ditch bank, with his shotgun on his lap, to watch his headgate and protect himself against a previously threatened violent attack by Maloy, and, while thus seated on the main road bounding his property, the deceased rode up on a mule to the north boundary fence, stopped near the gate, about 12 or 15 feet west of the main ditch, reached back to his hip, and said to the appellant, "You G—— d—— s—— of a b——, you move and I will kill you," that the defendant instantly fired to protect himself from Maloy's threatened assault; that the deceased dropped off the mule on his knees and hands, threw something toward the ditch, broke, and ran west about 30 feet,

and fell into the weeds near the side of the road. There was much evidence of bad feeling between the defendant, on the one side, and Maloy, McElyea, and Denny, on the other, and of previous threats, counter threats, and verbal assaults.

A number of errors are assigned, which will be considered in the general order set out in the appellant's brief.

[**1**]   1.   Upon the trial of the case defendant's counsel asked the witness Luther this question:

"But there was some feeling between Maloy and Denny and McElyea, on one side, and Mr. Stewart, on the other—you knew that didn't you?"

To which the witness replied:

"I didn't know so much about it.   I knew there was a little difference between Mr. Denny and McElyea, on one side, and Mr. Stewart, but I never heard Mr. Maloy's name brought into the argument at all."

Upon redirect examination, counsel for the state propounded this question to the witness:

"Mr. Sutherland has asked you whether or not you knew that ill feeling existed between Mr. Denny and Mr. Stewart. Did you ever hear that Wesley Stewart had threatened to kill Mr. Denny?"

To which the witness answered:

"I had heard rumors to that effect; nothing definite."

This question and the answer were objected to by the defendant as immaterial.   No reason for its immateriality was suggested in the objection, nor in the brief in this court, and we are unable to determine the grounds upon which this objection is urged.   No authority is cited; it being merely alleged that it was highly prejudicial to the rights of the appellant, without any suggestion as to how the defendant was prejudiced.   In the brief, counsel state that it is unneces-

sary to cite authorities in support of the well-known and well-established rules of evidence upon which the objection is founded. Ordinarily, an objection, in general terms, to evidence on the ground that it is incompetent, irrelevant, and immaterial, without calling the attention of the court to the specific reason why such evidence is incompetent, irrevelant, and immaterial, is too general to base an exception to a ruling of the court overruling such objection. 3 C. J. 818, 819, § 733, and cases cited in note 26; McKenzie v. King, 14 N. M. 375, 93 P. 703; Noll v. Nolan, 135 Ga. 712, 70 S. E. 577.

[2]    2. Another excepton is to the admission of the following writing, signed by the deceased, and attested by two witnesses, purporting to be a dying declaration of the deceased, relative to the shooting:

"Friday
"Pichaco, August 12, 1921.
"As I was going to my work, I saw Mr. Stewart walk off 100 the bridge about Three yds. distance from where I was and disappear in the corn field near where I had a job to do. I rode up to the fence leanded over on my mule and called to him in a respectable manner to come out and talk the matter over with me and settle the matter like men. He answered saying throw up your hands or I will shoot you. I told him I would not throw up my hands to any man (as I had done nothing), and he then shot me without hesitation. I could not see him when shot me or any time afterwards. Mr. Stewart and I had always been on friendly terms prior to the time I had taken the job as ditch boss
"(Signed) George I. Maloy.
"T. C. Sexton.                    Oscar McElyea."

This statement was reduced to writing by McElyea, one of the witnesses. The admission of this paper in evidence was objected to by the defendant, upon the grounds, among others, that it was not shown that the declarant was without hope or expectation of recovery; that the instrument in its entirety was not sufficiently established; that certain interlineations therein were not sufficiently explained; and that its admission in evidence contravened the constitutional rights of the appellant.

Before a dying declaration is admissible in evidence, it must be shown that it was made under a sense of impending death, and without any hope of recovery on the part of the declarant. It should be admitted with scrupulous care, since it was in the absence of the defendant and not under the sanction of an oath, and the declarant was not subject to cross-examination, and was in no peril of prosecution for prejury, and there was grave danger of omissions or unintentional misrepresentations, both by the decedent and the person reducing the statement to writing. 30 C. J. 263, 1 R. C. L. p. 530, and cases cited; Underhill's Cr. Ev. (3d Ed.) §§ 170, 171. While it is indispensable, as a predicate to its admission in evidence, that it must be shown to the court that the declarant was possessed with a consciousness of impending death, the fact that it was made in such a state of mind may be proven, not only by the declaration of the decedent, but by other relevant evidence, and may be inferred, as well, from the surrounding circumstances, if these establish clearly that it was made under such a belief. See Harper v. State, 79 Miss. 575, 31 So. 195, 56 L. R. A. 372, and elaborate case note at pages 406 et seq.

"The statement of the accused (declarant) tending to show his knowledge or belief that he is dying, and that he entertains no hope of recovery, though a part of the declaration, is always admissible. It is perhaps the most satisfactory and convincing evidence of consciousness of approaching death in his mind but it is not the only evidence, nor is any particular form of words required of him." Underhill's Cr. Ev. (3d Ed.) § 172.

Any language indicating a brief, on the part of the declarant, that imminent death is inevitable, or any conduct evidencing such a state of mind, is sufficient to authorize the admission of such declaration. So, also, is a statement of the attending physician or others to such effect made to the deceased, apparently acquiesced in by him. Underhill's Cr. Ev. (3d Ed.) § 172.

In the case of Territory v. Eagle, 15 N. M. 609, 110

P. 862, 30 L. R. A. (N. S.) 391, Ann. Cas. 1912C, 81, this court held:

"Where a dying person makes no declaration that he knows his danger or is conscious of his impending death, and there is nothing in his conduct or that of those present, understandingly acquiesced in by him, from which consciousness of impending death may be ascertained; yet, where it is reasonably to be inferred from the terrible character of the wound and his state of illness that he was sensible of his danger and conscious of impending death, his statements, made under such circumstances, relative to the homicide, are properly admitted as a "dying declaration."

In Jones v. State, 130 Ga. 274, 60 S. E. 840, it is held:

"In the trial of a murder case, if at the time of making declarations the condition of the wounded party making them, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a prima facie case that he was in the article of death and conscious of his condition when he made the declarations, and such declarations should be admitted in evidence by the court, under proper instructions to the jury."

See, also, Dumas v. State, 65 Ga. 471.

In the instant case the only evidence introduced relative to the dying declaration was that of the attending physician, Dr. C. T. Sexton, who also appears as a witness to the statement introduced. The testimony of Dr. Sexton was to the effect that he was called to see the wounded man at 9 o'clock a. m., on the date of the homicide, and found him suffering from a gunshot wound; that there was a wound in the abdomen, on the left side, near the edge of the ribs, about the anterior axillary line, and several shot in the thigh, two of which perforated the vessels, with quite a bit of subcutaneous hemorrhage. The patient was quite badly shocked, had no pulse, was cold and pallid, his skin was clammy, and he was vomiting and had severe pain in his abdomen: that he gave him a hypodermic to relieve the shock and stimulate his heart, and dressed the wounds; that at the time of his first visit he thought if the effects

of the shock could be relieved and his physical condi-
tion built up, that the patient might be relieved by a
surgical operation, which would save his life; that, in
a general way, he explained this situation to the pa-
tient, telling him that he was not then in a condition
to be moved for an operation, but that he would have
to build him up and restore him from the shock be-
fore an operation could be performed.    The patient
made no reply, but he assumed that he understood
the situation; that he conveyed this information to
the patient and to the bystanders, and this was the
condition when he left the patient, about 10 o'clock,
to town to get some additional tablets for hypoder-
mic use, as his supply had been exhausted; that the
patient said nothing to him as to his opinion of his
physical condition after the doctor had explained to
him the manner in which he proposed to handle his
case, and offered no suggestions whatever, nor did he
at any time say anything to him indicating that he
expected to die, and he assumed that the patient
understood what he told him as to his hope for a
successful outcome by this treatment.    He returned
at 11:50 o'clock a. m., and found that the patient
had not rallied, and left him again between 12 and
one o'clock, at which time he had no hope for his
recovery; that when he left the first time he still had
hopes of Maloy's ultimate recovery, but that he did
not have such hopes when he left the second time;
that the statement was made shortly after he arrived
on his first visit, at a time when the patient was
quiet; that he was not vomiting constantly and per-
sistently; that it came on in paroxysms; that he was
not turning or twisting all the time, but had periods
of quiet; that the statement was made during a quiet
period; that the death of Maloy was caused by shock
produced from gunshot wounds.

From the foregoing, it will be seen that the only evi-
dence introduced to show that the deceased was con-
scious of approaching death, was that of the actual
character of the wound and its seriousness, and of his
physical condition resulting from the shock of the

gunshot wounds. The question before us is: was this evidence sufficient to establish prima facie that the declaration was made under the sense of impending death? On pages 618 of the opinion (110 P. 864) in the Eagle Case, supra, the court said:

"Under the foregoing evidence, it then became necessary to determine whether the dying declaration of Santiago Eteewa as made under the sense of impending death and therefore became admissible under the rule hereinbefore stated. There being no expression from Eteewa himself from which this can be determined and nothing in his conduct at the time the declaration was made from which it may be inferred that he was conscious of his condition, and no communications having been made to him by his medical adviser or friends which were assented to or understandingly acquiesced in by him, we must rely solely upon the terrible character and extent of the wound inflicted, in determining whether Eteewa was under the sense of impending death at the time he made the declaration admitted in evidence as a dying declaration."

So, in the present case, we must rely solely upon the character and extent of the wound, and the shock produced thereby, at the time the statement was made, to determine whether it was made when Maloy was under the sense of impending death. In ruling that the dying declaration in the Eagle Case was admissible, the court quotes as follows from 3 Wigmore on Evidence (2d Ed.) § 1442:

"We may avail ourselves of any means of inferring the existence of such knowledge; and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude."

On page 619 of the opinion in the Eagle Case (110 P. 865), the court further said:

"From his testimony (quoted supra) it appears that the wound was of such a terrible nature and character that his symptoms as to vomiting, internal bleeding, subnormal temperature, rapid pulse, distended abdomen, and later the excretions from the wounds, were of such a serious and dangerous nature that it must be inferred therefrom that Eteewa was conscious of his condition and under the sense of impending death at the time the statement was made."

After quoting from Anthony v. State, Meigs (Tenn.)

265, 33 Am. Dec. 146, in support of his conclusion the court, in the Eagle Case, again says, on page 620 (110 P. 865):

"The facts in this case therefore can lead but to one conclusion, viz., that the statement of Santiago Etweea was made under the sense of impending death and properly admitted as a dying declaration."

It appears from the evidence quoted in the Eagle Case · that where the bullet entered the body there was a small puncture, but where it left the body there was a large gaping wound, from which there was bleeding, and from which there was, on the second day after the shooting, a discharge of intestinal contents; that he was conscious, but in a rather semi-conscious or dazed condition; and later developed almost incessant hiccough; that the doctor, when he first saw the wound knew that it would be fatal, and told his friends that he would die in a few days, although this fact was not indicated to Eteewa. It also appears that at the time the statement was written down, in the Eagle Case, a Mr. Allen stated to deceased that he would send for a notary to reduce the statement which had previously been made by Tteewa to writing, and that it was the opinion of this witness, from Eteewa's general condition, that he would die.

In the Jones Case, cited supra, it appeared that the declaration was made 15 minutes before his death, and a short time after he received the wounds which caused his death; that the deceased was found lying on the ground near his home a short time after pistol shots were heard, shot through the heart, and the words testified to were the only words he uttered after he was found. The court held that, though there was no direct testimony that the deceased was conscious of the fact that he was going to die, the evidence was sufficient to warrant the conclusion that he was aware of this fact when he made the statement. The statement in the Jones Case was admitted to the jury, upon an instruction that they should examine the

facts and circumstances under which it was made, and determine whether the same had been made voluntarily. In the Dumas Case, cited supra, the deceased was shot in the base of the brain, and stated that his head felt like it was about to burst open, and called upon a bystander to examine the wound, and shortly after this he swayed and leaned forward, but was afterwards unconscious, and died in a short time. It will thus be seen in the Eagle Case that the wound itself was of such a nature as to have convinced the doctor and also others who saw it, that it was necessarily fatal, and that the physical symptoms had so far progressed as to make a realization of this result a certainty. In the Jones Case the wound was in the heart, and the statement was made during the only conscious interval between its infliction and the death of the deceased. In the Dumas Case the circumstances were very similar. The wounds in all these cases were such as to have carried the conclusion to any reasonable man that they must necessarily have resulted in death at once, and it was upon this ground that they were admitted. There are decisions to the effect that, although the attending physician or surgeon may believe the wounded man to be progressing favorably, and even when such belief is expressed to the declarant, the dying declarations can be admitted, when it appears from other evidence that, in spite of such belief or of such expressions on the part of the physician, the declarant believed that death would necessarily result from the injury. People v. Simpson, 48 Mich. 474, 12 N. W. 662; State v. Bradley, 34 S. C. 136, 13 S. E. 315; Wheeler v. State, 112 Ga. 43, 37 S. E. 126; Stevens v. Commonwealth, 47 S. W. 229, 20 Ky. Law Rep. 544. But in each of these cases there is other and independent evidence that the deceased had indicated his settled belief of his approaching death, in spite of the statements or opinion of the physician that there was hope that he might recover. From our examination of the cases, supporting the proposition that the sense of impending death which a dying person must have had, in order to render a

dying declaration made by him admissible in evidence, may be inferred from the nature of the wound or the state of his illness, without any express declaration to show that he was sensible of impending death, we do not find any case which, upon its facts, goes further in support of this view than the Eagle Case of our own territorial court, and in all of them it appears to have been shown, either by the statements of the physician or of the wounded person, or by other compelling circumstances, that the nature of the wound was either fatal, or was believed by either the physician or the wounded person to be fatal, and such as to justify the finding of the court that the wounded person was aware of his approaching decease at the time the declaration was made.

But no such conclusion can be drawn from the evidence in this case. From the testimony of the physician here, it nowhere appears that he considered the wounds in and of themselves necessarily fatal; nor did the deceased die from the direct results of the wounds, but from the shock incident to his wounding. Apparently the physician had strong hopes that he would be able to overcome the effects of this shock at the time the declaration was made, and that the patient's condition, after the immediate effects of such shock were overcome, would be such that a successful operation might be performed; and it was the opinion of the physician that this impression was conveyed to the deceased, and apparently acquiesced in by him. So it will be seen in the present case that a knowledge or inference that the wound would result fatally was absent on the part of the physician at the time the statement was made; that this belief on his part was inferentially conveyed to the patient, who by no word or act indicated that he did not accept this conclusion as correct; and, if the skill of the physician was such as to justify confidence in his conclusion, this is a case in which the nature of the wound was such as to contraindicate that it would be fatal, and was not of such a nature that an inference of imminent death could be drawn therefrom. A citation

of cases supporting the doctrine of the Eagle Case will be found in the report of that case in Ann. Cas. 1912C, at page 85. While not reviewing all of those cases, we will refer to a few of them, and to the circumstances which differentiate such cases from the instant case. The case of Mattox v. U. S., 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, is referred to in practically all of the text-books and cases which assert the application of the rule of evidence declared in the Eagle Case. In that case the attending physician regarded the recovery of the wounded man as hopeless, and, upon an inquiry from the wounded man as to his condition, the physician told him that the chances were all against him, and that he did not think there was any show for him at all, and this information had been imparted to the wounded man before the dying declaration was made. The declaration in that case was offered on behalf of the defendant, and the refusal to admit the declaration was declared by the court to be error. In the case of People v. Samario, 84 Cal. 484, 24 P. 283, the deceased, when encouraged with the statement to keep up his courage, that he was not going to die, and that he would probably get up to-morrow, answered: "Oh, no, I am going to die." In State v. Gray, 43 Or. 446, 74 P. 927, it appeared that the deceased, prior to his death, had been informed by his physician that he could not recover, and the physician had at that time suggested the making of a statement.

We therefore feel justified in saying that there are no cases which go further to establish the admissibility of such statements, from evidence of the nature of the wound alone, than the Dumas and Jones Cases from Georgia, cited supra, and the Eagle Case from New Mexico. Nor do we believe that the rule of evidence admitting such statements, where the only evidence of the conviction of impending death on the part of the wounded person is to be derived from the nature and extent of the wound, should be extended beyond the ruling in those cases.

While it appears that on the second visit of the physician he realized that there was no hope of Maloy's recovery, it does not appear that the statement was reiterated by Maloy after this situation was evidenced. The realization of approaching death must exist at the time the statement was made, unless it was afterwards reiterated with such consciousness on the part of declarant. Wigmore, in his work cited supra, in section 1439, lays down the rule as follows:

"This consciousness must, of course, have been at the time of making the declaration."

See note 1, citing R. v. Spilsbury, 7 C. & P. 190; Walker v. State, 52 Ala. 195; May v. State, 55 Ala. 41; Donnelly v. State, 26 N. J. Law, 618. This, we consider, is the correct rule, and the opinion of the physician formed at a visit subsequent to the one at which the declaration was made would furnish no basis for its admission.

In the present case there is an entire absence of any facts or circumstances which would support a finding by the court that Maloy believed that his wound was fatal when he signed the statement, nor can such a belief be inferred from the nature of the wound itself and the circumstances existing at the time the statement was made; and it is our conclusion that the court erred in admitting the dying declaration upon the evidence adduced.

[3] 3. In the first sentence of the dying declaration, there appears an interlineation of the figures "100" above the word "three," which followed by the abbreviation "yds.," and it does not clearly appear whether this means that the bridge was 100 yards or 300 yards distant. It also appears that there is a parenthetical expression introduced into the sentence, "I told him that I would not throw up my hands to any man (as I had done nothing), and he then shot me without hesitation," which, it is stated in the brief of appellant, appears as an interlineation in the

original paper. Mr. McElyea, who reduced the declaration to writing, and who propounded the questions, and who apparently made the interlineations, was not introduced as a witness, and only evidence in regard to them is a statement of the attending physician, who was busy with other matters at the time, that it is his recollection that the interlineations were made as corrections to the writing, when it was read to Maloy, and just before he signed it. The distance about which there is uncertainty may have been an important fact in the minds of the jury, in determining the guilt of the accused, and the ambiguity should have been explained, either by the witness who wrote it or by some one who understood its meaning, if such evidence was accessible. While we do not hold that, if the evidence had justified a finding by the court that Maloy was aware of his impending death, the declaration could not have been admitted on the testimony of Dr. Sexton as to the proof of its execution, yet we do think that any ambiguity therein, which could have been explained by other accessible witnesses, should have been cleared up at the time it was offered in evidence.

The declaration concludes with the following statement: "Mr. Stewart and I had always been on friendly terms prior to the time I had taken the job as ditch boss." Dying declarations are only admissible as to the circumstances attending the infliction of the mortal wound, in the nature of res gestae, and statements of other facts or conclusions on matters not directly relating to the infliction of the injury, though contained in such declaration, are not admissible. Underhill's Cr. Ev. (3d Ed.) § 177; 3 Wigmore on Ev. (2d Ed.) § 1434, and cases cited in note 1. However, no objecton was made to the admission of this portion of the dying declaration, for the reasons here indicated, and this question is not before us.

[4]  4. There is no merit in the objecton that the admission of the dying declaration involved a viola-

tion of the constitutional rights of the appellant under the Constitution, treaties, and laws of the United States.

''The admission of dying declarations does not violate the constutional provision, that the accused in a criminal case shall be confronted by the witnesses against him. The constitutionality of such evidence has seldom been challenged by the bar or questioned by the judiciary. The fallacy of the objection consists in the supposition that the deceased person, whose dying declarations are proved, is the witness in the case. The witness by whom the accused has the right to be confronted is the one who testifies to the truth of the declarations. No proposition is plainer than that this clause of the several Constitutions was not designed to proclaim any novel principle. It is but the repetition of the ancient and well-established principle of the common law. It was never construed in England, whence, with our great system of common-law jurisprudence, it is derived, to exclude such evidence as was crystallized into that system, and recognized as a vital part of it, upon wise principles of policy, expediency, or necessity.'' 1 R. C. L. pp. 529, 530, § 71, and cases cited in note 3; Campbell v. State, 11 Ga. 353; Jones v. State, 130 Ga. 274, 60 S. E. 840.

See, also, cases assembled in note to Worthington v. State (92 Md. 222, 48 A. 355, 84 Am. St. Rep. 506), in the report of that case in 56 L. R. A. at page 357.

[**5**] 5. Error is alleged in the exclusion of certain testimony sought to be elicited from Manuel R. Chavez, a witness for the defendant. The following extract from the examination by defendant's counsel, taken from the transcript, shows how the queston arises:

"Q. Did you see Mr. Renn there that afternoon? A. I did.

"Q. What took place further than what you have told?

"Mr. Newell: We object to anything that took place between him and Renn.

"The Court: Sustained."

It does not appear that the defendant informed the court what he expected to show had taken place between Maloy and Renn. The question does not disclose the matter inquired about, nor was any tender of evidence made. We are wholly at loss to know what was expected to be proven. The testimony of Renn, taken

on a previous occasion, was introduced in evidence, which disclosed that, when Maloy ceased speaking to Stewart on this occasion, he ran off the steps and up against him, and started to speak, and said that Renn had been talking about him, whereupon Renn asked Maloy: ''Who are you talking to?'' And Maloy looked up, never said a word, closed his knife, got on his horse, and was gone. However, there is nothing to indicate, from the question propounded, that this was the subject of the inquiry. In the case of Diamond X Land & Cattle Co. v. Director General of Railroads et al., 27 N. M. 675, 205 P. 267, this court held:

"In the absence of an offer of proof, action of the trial court in excluding evidence cannot be attacked on appeal."

See, also, Territory v. Kelly, 2 N. M. 292, 306, 307; Insurance Co. v. Mercantile Co., 13 N. M. 241, 82 P. 263; State v. Goodrich, 24 N. M. 660, 176 P. 813; State v. Anderson, 24 N. M. 360, 174 P. 215.

We do not thnk that the decision in the case of State v. Ardoin, 28 N. M. 641, 216 P. 1048, has any application to the facts of the present case, for the reason that here there was no suggestion that the object of the inquiry was to show other specific acts of violence.

[6] 6. Another ground of error alleged is based upon the refusal of the court to admit certain preliminary testimony as the foundation of introducing other testimony relative to an experiment alleged to have been made during the trial by the defendant's counsel and others. J. O. Luther had testified that he was at work on a lateral to an irrigation ditch at a point about 800 feet south of where Maloy was killed and that from this distance he heard the conversation between Maloy and the defendant, which he stated had occurred immediately prior to the shooting. The purpose of this experiment was to test whether it was possible for one situated where Luther stated that he was to have heard such a conversation between

persons situated where Maloy and the defendant were alleged, by him, to have been. For this purpose, a party of five, composed of the defendant's counsel and others, divided themselves in two groups, the one of two persons, whom we will call the speaking group, and the other of three persons, whom we will call the listening group. The speaking group first took their position at the place where Maloy was shot, and spoke in a loud tone of voice to the listening group, sta-tioned at the place where Luther was working at the time. The speaking group then changed their posi-tion to the place occupied by Luther, and the listen-ing group to the place where Maloy was shot, and with this change of position repeated the experiment. It was claimed that the results of the experiment showed that it was impossible for Luther to have heard the conversation, as detailed by him, from the place at which he was standing. As preliminary to the tender of the evidence relative to the experiment, the defend-ant introduced as a witness, Albert S. Curry who was in charge of the substation of the United States Weather bureau at the State Agricultural College, about three miles distant, to show from the records of his office the direction of the wind, the tempera-ture, the conditions as to sunlight, and the barometric pressure, on August 21, 1921, the date of the homi-cide, and on April 5, 1922, the date of the experi-ment. The court admitted the testimony as to these conditions on August 21, 1921, which showed that on this date the velocity of the wind was 7½ miles per hour; that the direction of the wind was from northwest to southeast; that the sun shone two min-utes during the hour from 7:30 to 8:30 a. m.; that the temperature was 82 degrees, and the barometric pressure was 26.35. The defendant then offered to prove, by this witness, from the records of his office, that during the same hour on April 5, 1922, the velocity of the wind was 7¼ miles per hour; that the direction of the wind was, for three minutes, from south to north, and for the balance of the hour from southwest to northeast; that the sun shone

during the full hour; that the temperature was 68 degrees, and the barometric pressure was 25.97.

Counsel for the state objected to the introduction of any evidence as to the atmospheric conditions on the date of the experiment, upon the ground that the conditions on the date of the experiment, upon the ground that the conditions on the two dates in question were shown to be different, as the wind was in opposite directions. This objection was sustained. The defendant then made a tender of this proof by Curry as preliminary to the offer of evidence as to the experiment and its results. Counsel for the state contend in their brief that, as the velocity of the wind was approximately 7½ miles per hour on each date, and in different directions, there was an adverse wind condition of 15 miles per hour, being the sum of the two opposing velocities, and that this showed a great dissimilarity in conditions. While this is true, the evidence relative to the experiment showed that the talking group was first so situated that the direction of the wind was contrary to that upon the date of the homicide, but later they changed their position from north to south, so that the relative positions of the talking and listening groups were similar to those of Luther and the deceased on the date of the tragedy. However, the question of the admissibility of evidence relative to the experiment itself is not before us at this time. The court having excluded the testimony of the conditions under which the experiment was made, there is nothing from which a comparison could be made to determine whether the conditions under which the experiment was made were similar or dissimilar to those on the date of the homicide.

Experiments to test the truth of facts testified to by witnesses, when properly conducted, are often helpful in determining the truth of such testimony. Experiments, as to whether or not words spoken under similar conditions where the defendant and the deceased stood could have been heard by a witness at the point where he alleged that he stood, would be admissible, if the conditions when the experiment was

made were similar to those when the transaction took place. On the other hand, evidence of an experiment, for the purpose of testing the truth of testimony that a certain thing occurred, is not admissible, where the conditions attending the alleged occurrence and the experiment are not shown to be similar. 10 R. C. L. 1002, § 119. Since proof of the similarity of such conditions is a necessary preliminary to the introduction of evidence relative to such an experiment, it is always proper for a person offering proof of an experiment to make proof of the preliminary conditions existing at the date such experiment was made. As was said by the Supreme Court of Washington:

"The question of admissibility of proof of similarity of conditions attending an accident and experiments is not a matter of discretion with the court." Amsbury v. Grays Harbor R. & Light Co., 78 Wash. 379, 139 P. 46, 8 A. L. R. 1.

Until such proof was made, the court was unable to determine whether the evidence as to the experiment was admissible. This preliminary proof is somewhat similar to that required before a confession or a dying declaration can be offered in evidence, and it is from a comparison of the similarity of such conditions that the court is able to determine whether or not the evidence is admissible. See 10 R. C. L. pp. 1000-1003; Amsbary v. Grays Harbor R. & Light Co., supra; Kohlhagen v. Cardwell, 93 Or. 610, 184 P. 261, 8 A. L. R. 11, and case note at page 18 of 8 A. L. R.; State v. Ortiz, 25 N. M. 229, 180 P. 284; Smith v. State, 2 Ohio St. 512; Wilson v. State (Tex. Cr. App.) 36 S. W. 587; Byers v. N. C. & St. L. R. Co.; 94 Tenn. 345, 29 S. W. 128. The existence of a slight dissimilarity of conditions is not sufficient to exclude evidence of an experiment. As is said in 1 Wigmore on evidence §442.

"This similarity need not be precise in every detail. It need include only those circumstances or conditions which might conceivably have some influence in affecting the result in question."

In any view, the defendant here was clearly entitled to introduce this preliminary testimony, in order that his right to introduce evidence of the experiment might be determined. The court therefore erred in refusing to admit the excluded testimony of Albert S. Curry.

[7] 7. There was no error in excluding the testimony regarding the movements of the appellant following the shooting. The state did not attempt to show any flight on the part of the defendant; nor was there any contention upon the part of the state that the defendant sought in any way to conceal himself or prevent his arrest after the shooting. The testimony offered was therefore immaterial and inadmissible.

[8] 8. Another error assigned is to the admission of certain testimony as to a controversy alleged to have occurred between the defendant and one Juan M. Delgado some four or five years prior to the trial. This testimony was admitted, upon the statement by the state's counsel that it would be connected, but the effort so to connect it was abandoned, and upon motion of the defendant's counsel the testimony was withdrawn from the jury, and the judge instructed them to disregard it. The testimony was not, in our opinion, of such a nature as to prejudice the rights of the defendant to such an extent as to require a new trial, in view of its withdrawal from the jury and the instruction by the court to the jury that they should disregard the same. Defendant made no motion for a mistrial, and apparently acquiesced in the action of the court.

[9] 9. The error assigned in the admission of the rebuttal testimony of J. W. Denny is without merit. This testimony was in denial of certain testimony offered by the defendant, and was competent for that purpose. Nor was there any error in refusing to permit the defendant, upon cross-examination of the witness Denny, to show that Denny had said to the defendant: "Wesley Stewart, if you don't quit

monkeying and trying to turn this ditch over to the government, there is going to be the biggest killing that you ever heard of.'' The identical question had previously been fully answered without objection, and no harm could have come to the defendant from the court's refusal to permit its reiteration.

10.   Since the cause is to be reversed upon other grounds, it is not necessary to consider the error alleged, upon the refusal of the court to declare a mistrial, because of the demonstration on the part of the wife of the deceased during the argument of the case before the jury.

For the errors hereinabove set out, the judgment of the trial court is reversed, and the cause remanded for a new trial in accordance with this opinion; and it is so ordered.

PARKER, C·J., and BOTTS, J., concur.