[No. 576.   August 21, 1894.]

## TERRITORY OF NEW MEXICO, APPELLEE, v. HIPOLITO ARMIJO, APPELLANT.

CRIMINAL LAW—UXORICIDE—MURDER—VERDICT—ADMISSION OF ILLEGAL TESTIMONY—NEW TRIAL.—In a prosecution, on an indictment of the defendant for the murder of his wife, where the jury returned a verdict of conviction for murder in the first degree, and the legal testimony fairly showed they might have reached a verdict of conviction for murder in either the first or second degrees, and that, as between these two degrees of murder, their minds might well have wavered, and illegal evidence was admitted, which had a tendency to persuade them to the conclusion arrived at, of murder in the first degree, under such circumstances the defendant can not be considered to have been certainly convicted on the legal evidence in the case, and it not being apparent that injury did not occur, he was entitled to a new trial.

ID.—DECLARATION OF DECEASED—RES GESTAE—EVIDENCE.—A statement made by the deceased to her brother twelve hours before her death, and while showing him bruises on her person, that the defendant had beaten her, was inadmissible as a part of the res gestae, where it did not appear from the evidence what length of time had elapsed, after the bruises were received, before the statement was made.

APPEAL from a judgment of the Third Judicial District Court, Sierra County, convicting defendant of murder in the first degree. Judgment reversed, and new trial ordered.

The facts are stated in the opinion of the court.

A. B. ELLIOTT for appellant.

EDWARD L. BARTLETT, solicitor general, for the territory.

Appellant in his assignment of errors refers to "a portion of the jury" as having been erroneously allowed "to separate after they had been examined and accepted, and before a full jury was impaneled," and his citations refer to a "jury," when as a matter of fact and law there was no jury at that time, only a possible or prospective jury, which might be made up from the list, and in which the portion already accepted might be included. State v. Burns, 33 Mo. 488, and cases cited; Territory v. Nichols, 3 N. M. (Gil.) 107.

The evidence objected to under the third assignment of errors was properly admitted. People v. Harris, 33 N. E. Rep. 65; 33 Id. 1016.

The instructions given by the court are more favorable than those approved by the court in Faulkner v. Territory, 6 N. M. 464; see 9 Am. and Eng. Encyclopedia of Law, p. 734, and cases cited.

If the instructions given are within section 2055, Compiled Laws, which may be doubted, they are without the slightest comment upon the weight of the circumstantial or other evidence in the case. Territory v. Trujillo, 7 N. M. 50.

The jury having found defendant guilty of murder in the first degree, he could not have been prejudiced by a refusal in a lesser degree. Territory v. Nichols, 3 N. M. (Gil.) 109; Territory v. Yarberry, 2 Id. 463.

The receiving of the verdict was a purely ministerial act while the passing of the judgment was a judicial act. Territory v. Nichols, 3 N. M. (Gil.) 106.

The record does not show that any exception was taken at the time to the court's overruling the defendant's motion for a new trial and in arrest of judgment, and it can not be considered here. Sec. 2197, Comp. Laws.

If there is any evidence at all to support it, the verdict will not be disturbed where there is a conflict of evidence.    Territory v. Trujillo, 7 N. M. 47.

The proof need not conform strictly to the allegations contained in the indictment as to the method of killing, so long as the general manner of producing the death is proved as charged.    Am. and. Eng. Encyclopedia of Law, p. 634, and cases cited.

All legal doubts were solved in defendant's favor, and he was convicted upon questions of fact alone. He went upon the stand himself, testified in his own behalf, and the jury refused to believe his story, which they had the right to do, and found him guilty as charged.    Territory v. Yarberry, 2 N. M. 457.

COLLIER, J.—The record in this case shows that defendant in the court below, and appellant here, was indicted in the district court of Sierra county for the murder of Rosa Torres de Armijo, as occurring the twenty-sixth day of July, 1891, by choking and strangling.    He was put upon trial at the March, 1893, term of said court, and, the jury being unable to agree, a mistrial was declared.    He was again put on trial at the October, 1893, term of said court, and a verdict rendered of guilty of murder in the first degree, with a recommendation to mercy.    A motion for new trial being overruled, and defendant sentenced, the case comes here for review by appeal.

The case is one of circumstantial evidence.    The undisputed facts disclosed by the testimony are substantially as follows:    The deceased, Rosa Torres de Armijo, was the wife of defendant, they having been married about thirty years.    That there were three children of the marriage, but neither of the children was with the parents at the time of her death, which occurred in the early part of the night of July 26, 1891.    That defendant left his wife alone at their house

on the morning of said July 26, 1891, and remained away until about sundown. That he and deceased were visited at about dark by one of the witnesses for the territory, who was asked by defendant to take supper there, but declining, he was given by deceased a cup of coffee, which he drank. That said witness left defendant and deceased together at their house, and about half an hour later he met and was talking with defendant at another house, a short distance away. That about an hour or more after he saw defendant he heard of the death of his wife. That defendant was present with others, in the early part of the night, where they were threshing wheat. That he left said place, and in about the time it would take for him to get to his home he was heard calling for assistance, and, returning to the threshing ground, he requested the aid of the men in getting his wife out of a hole into which he claimed she had fallen. That one of said men went with him to the house, and finding his wife lying with her feet on the bank of the hole, and her head in the water, they together dragged her out, and found life to be extinct. This hole was shown to be within a few yards of the door of the house. The night was dark, and drizzling rain. In a very short time the body of deceased, who, defendant claimed, had fallen into the hole in his absence, and was drowned, was by her brother, who had arrived there, and by defendant, placed on the back of the man who assisted in dragging it out of the hole, was carried to her brother's house, some three hundred yards away, and there washed and dressed for burial. There was testimony by the territory that upon one side of the throat of deceased were three bruised and scratched places, and on the other side one bruised place, as if made by fingers and finger nails; a bruised, bluish spot on her stomach, as if made by the pressure of a knee thereon; and the head moved about as if the neck was

broken. The brother of deceased also testifies that on arriving at the house where the dead body of his sister was found, he charged defendant with having killed her, and he remained silent, but in the course of the talk there he said his wife had fallen into the hole, and was drowned. There was contradictory testimony about the quantity of water in the hole, ranging from a depth of four inches to as many feet. There was also testimony of maltreatment by defendant of his wife, extending over a very long period, which will be noticed later on, and of the defendant having illicit relations with a woman to whom he was married within a short time after his wife's death. There was also testimony, both by the prosecution and the defense, that the deceased was subject to fits or spasms, mild in their character, and merely causing deceased to remain quiet a few moments but not losing control of herself, as stated by witnesses for the prosecution; and so decided, as stated by the defense, as to cause her to fall over suddenly, and remain as if dead. These fits were stated by the witnesses for one side to have resulted from maltreatment and abuse by the husband, and by the defendant to have been caused by illness consequent upon childbirth several years before. The evidence of maltreatment rests almost entirely upon the testimony of the relatives of deceased, though several other persons appeared as witnesses, and all residing in the immediate neighborhood. The record shows that this testimony is in great part hearsay, and often elicited by questions leading in form, which, for some unaccountable reason were not objected to. As far as a record can throw doubt and suspicion upon the entire testimony on the subject of maltreatment and abuse of deceased by the defendant, this record does it. Thus, the brother of the deceased, after repeatedly saying that he saw defendant break the arm, the leg, and jaw of deceased, all on one occasion, finally

admits that he never saw any such thing, but was merely told so by a third person a few moments after his arrival at the place where it is said to have occurred. The district attorney, without any objection whatever being made, propounded the following questions to the witness on that subject: "Q. Didn't he knock pretty near all her teeth out, also? A. Yes, sir; she had only a few left. Q. And you say you saw him beat her continuously? A. Continuously." The record has been searched in vain for any justification of such questions, and we suppose they must have remained unobjected to upon the theory that the jury's natural sense of justice would revolt at them. The witness, other than defendant, who last saw deceased alive testified to loud and angry talk addressed to her by defendant immediately before he went into the house where the two were alone; that he was given a cup of coffee by her, and invited to supper by him; that he left them together, and in the course of an hour, more or less, heard of her death, as already stated. Defendant testified to leaving his wife at the house, alive, when he went to the threshing ground, and on returning, and not finding her in the house, he sought around in the dark, after discovering that the water pail was gone, and he came upon her feet near the hole of water, and then gave the alarm. He denies that he heard any such accusation made against him as testified to by her brother. Three witnesses for the defense, who were of the four who washed the body of deceased, testified that they examined it, and neither one saw on it the marks on the throat or stomach detailed by witnesses for the prosecution, nor did they hear a word said in reference to any such marks, nor as to the neck of deceased being broken.

In the instructions to the jury, delivered by the learned judge presiding at the trial, they were told

VOL. 7. N. M.—28

that the defendant might be found guilty of murder in the first or second degree, or they might return a verdict of not guilty. I think that the legal testimony in this case fairly shows that the jury might well have arrived at either of said verdicts, and

MURDER: verdict: admission of illegal testimony: evidence: new trial.

that, as between the first and second degrees of murder, their minds might well have wavered. It becomes a duty to ascertain whether or not any illegal evidence was, as claimed by defendant, admitted, which had a tendency to persuade them to the conclusion they arrived at of murder in the first degree, which involves the death penalty, rather than of murder in the second degree. The theory for conviction must be that, upon defendant's arriving at his house, he continued the quarrel which was interrupted by the visit of the witness who, besides the defendant, last saw the deceased in life; that he assaulted his wife immediately or very soon after the visitor's departure; that he deliberately, and with the premeditated design of killing, choked and strangled her to death, and then, throwing or placing her body, head downward, in the hole of water, it remained there, in the dark and rainy night, while he went away, and returning, pretended to first discover it. There is no circumstance in this from which the conclusion of a deliberate, intentional killing could be drawn that would not equally apply to the inference of a killing perpetrated in the heat of passion, without design to effect death, but in a cruel and unusual manner, except the angry words heard by that visitor just before his entrance. So far as appearances went, that burst of anger had all blown away before he left, and she and he were offering to him the hospitality paid a guest. There is nothing in the means used to effect death to lead to the conclusion of an intentional killing. No weapon of any kind or character was resorted to. The fact of maltreatment, persisted in for a

number of years, if the testimony as to that is taken
as true in every syllable, should not persuade that, of
all times he maltreated her, he on this occasion intend-
ed to destroy her life; and if the testimony of illicit
intercourse, running over a long period of time, was
believed, that would not necessarily persuade that, for
the first time, he on this night fully intended to rid
himself of her forever. It will be seen, therefore, that,
if there was testimony bringing his alleged cruelty
down to this very date, it would and must have been a
powerful factor in persuading the jury that the inten-
tion to kill was in the mind of defendant, and that it
operated, not only in causing them to reject the theory
of death resulting from cruel treatment, without any
design to effect death, but also to reject all testimony
as to there being no signs of choking or strangulation,
and every other fact and circumstance in defendant's
favor that might otherwise have been given weight.
Was there such testimony, and if so, was it legal?

I quote from the testimony of the brother of the
deceased on this subject: "Q. When was the last time
you saw her alive? A. The twenty-sixth of July,
about 6 o'clock in the morning; about 6 or 7 o'clock.
Q. What, if anything, did you notice about her when
you saw her alive the last time? A. I was passing by
her house. When she saw me, she commenced to cry,
and I came up to where she was. I asked her what
was the matter, and she said that Mr. Hipolito had
beaten her. Q. State whether you noticed any marks
of violence upon her at that time. A. Yes, sir. Q.
State to the jury. A. The first mark I noticed was a
bruise on the right cheek, and I got off my horse, and
noticed that she had some bruises on her back. Q.
Describe the nature of those marks on the back. A.
They were as if they had been made by a whip or a
club or a stick." He then says that her clothes were
torn. On cross-examination the following occurred:

"Q. You say she came to meet you? A. She was standing at the door when she saw me coming on the other side of the acequia madre. It ran right close to the house. Q. Could she walk about then? A. Yes, sir; she could walk some. ·She always walked some, but she was hurt on account of a beating he had given her." All this was objected to by defendant's counsel, and upon cross-examination, it being shown that there were no marks at that time on her throat tending to show strangulation, the objection to the testimony was renewed, and motion made for its withdrawal upon the ground of not being res gestae, of being hearsay, and as not tending to establish the allegations of the indictment, all of which was overruled. It is difficult to see how the fact of the wife being beaten early in the morning, some twelve hours prior to her death as a result of the strangulation then inflicted, has been shown, anywhere in the case, to have any connection, so as to make it res gestae of the latter transaction. It certainly can not be considered res gestae unless defendant is at least connected with, or in some way responsible for, that beating. This, the prosecution maintains, was shown by the declaration of the deceased made to her brother that "Mr. Hipolito had beaten her." It must be determined, then, whether or not this declaration was, in the language of Justice SWAYNE in Insurance Co. v. Mosley, 8 Wall. 397, made "almost contemporaneously with" or "immediately after" the beating. An investigation of the testimony sheds no light upon the exact time of the occurrence of the beating. It does appear that the deceased was alone at her home; that she saw her brother from her door, where she was standing; that she "commenced to cry;" and that he asked her what was the matter. The beating may have occurred ten minutes before, an hour before, and, for aught that appears to the contrary, even the night before. It was

*Margin note: DECLARATION of deceased: res gestae: evidence.*

the narration of a past occurrence.   It was not a spon-
taneous or involuntary utterance, in any sense of the
word, but was drawn out by questions, and the fact of
its connection with defendant depended for its proof
solely upon that narration.   The basis for its admission
seems to lack every element necessary to give it the
character of res gestae.   In Com. v. McPike, 3 Cush.
181, the declaration appears far more intimately con-
nected with the fact with which it dealt than does the
statement here.   There every moment of time is
accounted for between the act and the narration of it,
but here we must surmise as to whether the intervening
time was ten minutes, an hour, or several hours.   The
McPike case has been departed from in later decisions
of the same court, and the rule more stringently applied.
This declaration being, in our judgment, simply a nar-
ration of a past occurrence, we think it should not
have been admitted.   Without it the defendant has not
been sufficiently connected with the bruises and stripes
on the person of the deceased that morning, and the
testimony of the witness as to her appearance should
not have been admitted.   To hold that the mere fact
that a man's wife has the appearance of being beaten
some twelve hours prior to the time of her death is a
circumstance to go with other circumstances tending to
connect him with the later occurrence, where defendant
is absent all the intervening time, would, it seems to us,
make its admissibility rest upon a most slender and
dangerous foundation.   If it had been even shown that
the husband left his house, that no one else was seen
there, and immediately afterward his wife bore signs
upon her person of blows freshly inflicted, the case
might be different, but here no such testimony appears.
In several jurisdictions it has been held that, in a
criminal case, error in the admission of illegal evidence
presumes injury.   Again, it has been held that in
criminal cases the judge should be satisfied beyond a

reasonable doubt that no injury has resulted. The doctrine has also been stated to be that the admission of illegal evidence of an important fact, though but additional to other facts legally in evidence, requires a new trial, even though it may appear certain that the jury would have found a verdict as rendered. It is not necessary to go so far as that in this case, and we think that perhaps the rule to be adopted is that it must be apparent that no injury resulted to the accused from the admission of the illegal evidence. In this case it appears to us that the jury may, and probably did, reason that, if the last thing the husband does before leaving his home in the morning is to cruelly beat his wife, and almost the first thing at night, when he returns, is to violently assault and choke her, in such a way as to cause death, he must have deliberately killed her, while without such testimony they might have concluded that his offense amounted merely to murder in the second degree. Under these circumstances the defendant can not be considered to have been certainly convicted on the legal evidence in the case, and it is not apparent that injury did not occur.

The other assignments of error it is not deemed necessary to advert to, except to say, in general terms, that the instructions given by the learned judge to the jury are approved, as being fair, in every sense, to the defendant, and giving, as we believe, a clear and full exposition of the law applicable to the case. For reasons stated the judgment overruling the motion for new trial is reversed, and this cause is remanded to the district court, with directions to grant a new trial.

FREEMAN and LAUGHLIN, JJ., concur.