State v. McGhee, 23 N. M., 652

(No. 2087.   January 29, 1918.)

## STATE v. McGHEE.

### SYLLABUS BY THE COURT.

1.  A verdict will be set aside on appeal where there is
no substantial evidence to support it.   Evidence examined,
and held insufficient.                                    P. .655

2.  Dying declarations are admissible, although the facts
sought to be established by them may be, or have been,
proved by other witnesses.                                P. 656

Appeal from District Court, Socorro County;
Mechem, Judge.

Frank McGheewas convicted of murder in the second
degree, and he appeals.   Reversed, with instructions to
award new trial.

Nicholas & Nicholas, of Socorro, for appellant.

The dying declaration was inadmissable because the
facts included therein were not in dispute.   State v.
Valencia, 19 N. M. 113; Stewart v. State, 2 Lea (Tenn.)
598; State v. Johnson 118 Mo. 491; Binfield v. State,
19 N. W. 607; State v. McKnight, 21 N. M. 14.

George C. Taylor, Assistant Attorney General, for
the State.

It is no objection to admission of dying declaration
that exigencies of case do not require it.   Such dec-
larations are admissible although facts sought to be
established by them may be proved by other witnesses.
2 Michie on Homicide, 1079; 1 R. C. L. 529; Wigmore
on Evid. 1435; State v. Wilson, 36 Am. Rep. 257;
People v. Beverly, 108 Mich. 509; Commonwealth v.
Roddy, 184, Pa. St. 274; Lyles v. State, 86 S. W. 763;
State v. Saunders, 140 re. 305, 12 Pac. 441; 21 Cyc.
975 and cases cited; Chamberlayne on Evidence, Vol.
4, p. 3871, and cases cited.

OPINION OF THE COURT. .

PARKER, J.  The appellant, Frank McGhee, was convicted of murder in the second degree in the district court for Socorro county, and has perfected this appeal.

The evidence on the part of the state tended to disclose that a controversy arose between Francisco Sanchez and H. O. Webb concerning the ownership of a certain calf. An action in replevin to recover the possession of the calf was begun by Sanchez in a court of a justice of the peace and the calf was delivered to Sanchez with the understanding that he was to retain possession therefore until July 21, 1916, the day set for the hearing before the justice of the peace. Late in the night time of the 20th of July, 1916, the Sanchez household was awakened by noises indicating that men on horseback were approaching. Shortly thereafter the inmates of the Sanchez house heard noises indicating that some one had entered the Sanchez corral. Sanchez and two companions arose and discovered appellant in the corral in the act of driving away the calf over which the replevin suit arose. At the point of a pistol in the hands of Sanchez the appellant, who was unarmed, was taken into custody. Between 20 and 30 minutes after this time shots were heard near a gate in the vicinity of the Sanchez house. At the same time some one said, "Hands up!" and cursed. A number of shots were then exchanged between Alvaro Aragon, one of the companions of Sanchez, and some other person not identified by the evidence of the state except by the statement made by appellant at the time that the person who exchanged shots with Aragon was H. O. Webb. Aragon received a bullet wound in the thigh. Blood poisoning subsequently set in, and on July 26, 1916, he died. Tracks of the person supposed to have fired the fatal shot were discovered in the vicinity of the Sanchez property the day after the shooting occurred. Empty cartridge shells were also found there. The shells were of 30-30 caliber. Francisco Sanchez testified, among other things, as follows:

"I told him to raise up his hands, and he raised them. Then he told me not to kill him for the love of my wife and my family; not to do him any harm. Then I asked him what he was doing there, and he told me that he had went over there because they had sent him to see if that calf was there. And I says to him, 'Who sent you?' and he says, 'Bob Lewis,' and I says to him, 'Didn't Bob Lewis told you that something may happen to you if you come around to see about this calf; didn't Bob Lewis told you to come right straight to ask me, and.then I would show it to you?' Then he says, 'No, I made a mistake, pardon me.' Then I says, 'Get out of the corral; let's go in the house.' .Then he kind of held up and he says not to put him inside of the house; then he was crying and begging me that he greatly ashamed of my family. * * * I kept on trying to walk toward the house, but he would keep us from advancing, and let himself down on the ground and got up, and I was trying to urge him to go inside of the house. That way he kept us for quite a long while. Q. Just a moment. When he would lay down on the ground, did he remain silent, or did he make any noise? A. He was making noise. all the time. Q. Well, what kind of a noise did he make? A. He says, 'Let me go for the love of your father, for the love of your mother;' that he had made a mistake. * * * Q. Well, when you got Frank McGee—what occurred? A. Then I told Alvaro Aragon that his wife was delaying, and you better go and see what become of her, and about the other two men, and he went down below, and when he went to the gate of the fence, then I hear them start to fire somes hots."

Sanchez then threatened appellant with death if he did not divulge the name of the person who had shot Aragon, and appellant pleaded for his life, and declared that if Aragon had been killed that Webb had done it because he had accompanied the appellant to the Sanchez house. Other witnesses testified to facts tending to disclose that Webb and Votaw were present at the time Aragon was wounded, and that both of them fired at Aragon. Before the trial of this case Votaw pleaded guilty to murder in the second degree on account of his participation in the action which resulted in the death of Aragon and had been sentenced to serve a term in the penitentiary. A motion for a directed verdict was made by the appellant at the close of the state's case in chief, which was overruled by the court. It was renewed at the close of the case made by appellant and again overruled.

The case made by appellant tended to disclose that he and Votaw journeyed to the Sanchez corral for the

purpose of ascertaining whether the calf was penned with a certain cow. Before appellant had reached the corral Sanchez had demanded his surrender, at the point of a pistol. Appellant surrendered. Votaw concealed himself behind some trees. After hearing Sanchez threaten the life of appellant Votaw concluded that he should protect his companion. He thereupon left the Sanchez premises and journeyed to the house of a neighbor, where he obtained a gun upon the pretense that he desired to use it the following day. Votaw returned to the Sanchez house, and some one demanded that he throw up his hands. At the same time some one fired at Votaw. Votaw thereupon returned the fire, and continued to fire until his antagonist fell to the ground. Votaw testified that several men fired at him, because he could see the flash from their guns. Votaw then returned to his horse and went to the town of Kelly.

The appellant contends, among other things, that the court erred in admitting in evidence the dying declaration of Aragon, because other witnesses had testified to all the facts contained therein, and there was consequently no real necessity for the introduction of the declaration, and that the evidence is insufficient to support the verdict.

[1] The doctrine has long been established in this court that where there is any substantial evidence to support the verdict of the jury the same will not be disturbed on appeal. State v. Orfanakis, 22 N. M. 119, 159 Pac. 674; State v. McCracken, 22 N. M. 588, 166 Pac. 1174. The converse of the doctrine, viz. if there is no substantial evidence to support the verdict it will be set aside on appeal, is equally well established. State v. Graves, 21 N. M. 556, 573, 157 Pac. 160. The latter doctrine is applicable to the facts of this case. All that the case made by the state shows is that appellant was apprehended in the act of taking a calf from the Sanchez corral, and that a companion of Sanchez was wounded by a third person about 30 minutes after appellant was captured and while he was still in the custody of Sanchez. There

is no evidence of any action on the part of appellant resulting in the acts of the person who wounded Aragon. No concerted action on the part of appellant and the person who fired the fatal shot into the body of Aragon is shown by the state, except the circumstance that the noise of two or three approaching horsemen was heard by the Sanchez household and by others. No conspiracy to commit a felony or take the life of Aragon was shown to exist on the part of appellant and any other person, and we are satisfied that the death of Aragon resulted from individual action taken on the part of Votaw. The latter, according to his testimony, heard Sanchez threaten the life of the appellant, and concluded that he (Votaw) ought to procure a weapon and protect the life of his friend and companion. No connection is shown between the action of Votaw, in this regard, and the action of appellant, sufficient to assume that a conspiracy existed between them for the purpose of taking such drastic action. Nor is there any evidence whatever sufficient to sustain the verdict on the theory that appellant aided and abetted the commission of the crime. As a matter of fact the evidence of the state discloses that appellant did not aid and abet the commission of the crime, but was engaged in persuading Sanchez not to harm him or embarrass him before the Sanchez family. We are therefore constrained to hold that the evidence is insufficient to sustain the verdict.

[2] In view of our conclusion on the first point the only other proposition which should be considered is whether the court erred in permitting the state to introduce proof of the dying declaration of the deceased Aragon. Appellant's objection to the admission of this evidence is based upon the theory that such evidence is not admissible if the facts thereof are proved in any other manner. In other words, appellant insists that the court erred because there was no real necessity for the introduction of the dying declaration. The contention of appellant is fully answered by what is said in 1 R. C. L. "Admissions and Declarations," section 70, wherein the author says:

" * * * While necessity was no doubt the reason which relaxed the rule excluding hearsay testimony in favor of dying declarations, yet it is not indispensable that such necessity exist in each individual case. Thus, though there were many witnesses of the fatal encounter, that fact would not exclude the dying declarations of the deceased. Indeed, the admisibility of dying declarations in prosecutions for homicide has become an established rule of evidence, and such testimony is competent and is received independent of any question as to the paucity or abundance of other testimony."

Numerous cases are cited by the author under the foregoing quotation which sustain the doctrine announced. The trial court, therefore, did not err in admitting in evidence the dying declaration.

For the reasons stated herein, the judgment of the trial court will be reversed, with instructions to award a new trial; and it is so ordered.

ROBERTS, J., concurs. HANNA, C. J., being absent, did not participate.

### SYLLABUS BY THE COURT.