**97 P.2d·915**

**STATE v. SANFORD.**

**No. 4476.**

Supreme Court of New Mexico.

Dec. 29, 1939.

James L. Briscoe, of Tucumcari, and H. E. Blattman, of Las Vegas, for appellant.

Filo M. Sedillo, Atty. Gen., A. M. Fernandez, Asst. Atty. Gen., and M. E. Noble, of Las Vegas, for appellee.

ZINN, Justice.

This is an appeal from a judgment and sentence of death imposed upon John H. Sanford, the appellant. He was charged with the crime of having murdered his wife, Hallie B. Sanford, by administering her poison, arsenic, in a cup of coffee on the 14th day of July, 1938, and that she died as the result thereof on the 23rd day of July, 1938.

The facts and legal proposition pertinent to the decisive issue raised by the appellant, and the only one which needs to be considered in view of the result, are as follows:

On July 14, 1938, appellant arose at between 5 and 5:30 in the morning, made some coffee, filled a cup with it, and brought it to his wife at her bed. He then left the house. At about 7 or 7:10 he saw the Negro servant go by and spoke to her, and a little later he was summoned to the house with a message that his wife was ill. He returned immediately to his wife's bedside.

Upon arriving at her bedside he said to her, "What is the matter; you were all right when I left you", or words to that effect, and Mrs. Sanford answered, "I am awfully sick. That coffee that you gave me made me sick." Dr. Doyne was then called by Dr. Sanford, and when he arrived Mrs. Sanford stated she had drunk some coffee and said, "I am poisoned."

The first person to see Mrs. Sanford after Dr. Sanford left the house was a neighbor by the name of Mrs. Oma H. Wentworth. She testified that between 6 and 6:15 Mrs. Sanford called to her from Mrs. Sanford's back yard saying, "It is me, Mrs. Wentworth, I am awfully sick"; that Mrs. Sanford was vomiting constantly and screaming or crying; that she was very nauseated and vomiting all along and hold-

ing her stomach as she went back in the house; that she followed her into the house and led her to her bed. She further testified as follows:

"Q. Well, what did she say when you got in there? A. I says, 'Mrs. Sanford, what can I do for you?' She says, 'Not anything, just stay with me, I am so awfully sick'. I says, 'Isn't there something I can do?' She says: 'Just say with me, I won't be here long; Doctor Sanford has poisoned me.'

"Q. What else did she say as to how he poisoned her? A. I said, 'Surely not. Where is he?' She says, 'He gave me a cup of coffee this morning, and he has gone, and the coffee was poisoned.'

"Q. Now, during this time, Mrs. Wentworth, what was Mrs. Sanford doing? A. She was going back and forth from her bed-room to the bath-room and vomiting all the time; restless in the room.

* * *

"Q. What were her actions, Mrs. Wentworth? A. She was so very restless, very sick and crying, and begging me not to leave her. She said, 'it won't be long'. She says, 'Don't leave me, whatever you do.' I insisted there must be something I might do for her, and she said, 'There is nothing you can do, don't leave me.' One time when she went in the bath-room she turned to the linen closet and took out a cup and says, 'Look at this, this is not coffee grounds, it is poison.'

"Q. Did she complain of any pain, or anything of that kind, Mrs. Wentworth? A. Oh, yes. She said when she was drinking the coffee it was very peppery, when she took a swallow it was peppery. And she started to drink some more and in a few minutes she drank some more and began to vomit, and she had pains in her stomach.

* * *

"Q. You say that during all this time she was vomiting? A. She was vomiting at intervals, yes, and very sick and nauseated."

She also testified that Mrs. Sanford would not let her leave, until the Negro cook arrived; that after the cook had come she sent word to Dr. Sanford who returned to the house. Mrs. Wentworth testified that Mrs. Sanford begged her not to leave her and said over and over when Mrs. Wentworth would offer to do something for her: "There is nothing you can do, stay with me, I cannot stand this long I am so sick, it won't be long, just say with me."

Doctor Doyne, a witness for the state, testified as follows:

"Q. Did you see Mrs. Sanford on the morning of the 14th of July, 1938? A. I did.

"Q. How did you happen to go to the Sanford home on that morning? A. Well, just as I came back from breakfast, I was looking right at the clock when I walked in the room, and it was seven A. M., and the phone rang, and some woman, I don't know who it was, said 'go to the Sanford home right away, it is an emergency.'

"Q. And you did go right away? A. I did.

"Q. When you got there did you see Mrs. Sanford? A. I did.

"Q. What was Mrs. Sanford's condition, Doctor, when you saw her? A. She was very nervous, vomiting and retching.

"Q. Did she complain of any pain? A. Shall I say what she told me?

"Q. Yes, that is what I want? A. I went in and spoke to her, and she told me she had drank a cup of coffee and it was poisoned, because she could smell the poison.

"Mr. Blattman: What was the last answer? A. That she could smell the poison.

"Q. That she had drunk some coffee and it was poisoned, because she could smell the poison? A. Yes.

"Q. Well, did she then call your attention to anything else in regard to the poison, Doctor, I mean to a bottle or something of that kind? A. Not at that time. It was my time to talk then. I asked her how long she kept it down, and I have forgotten whether she said ten or fifteen minutes, and she started vomiting, and then she told me to smell the vomit.

"Q. How long did you stay there, could you tell, about? A. That I could not say. Shall I tell you what I did?

"Q. Yes, go on and tell what you did there? A. All right, she had vomited freely. I fixed about a half of anti-acid solution with bismuth in it and gave it to her. She vomited that. I watched her for a few minutes and then she had another spell of vomiting, but she didn't have the difficulty retching she had had before she took that, so I fixed another glass of anti-acid and bismuth and gave that to her. It stayed down, oh, I guess three minutes and then it came up rather easily and she seemed somewhat relieved. Then I mixed, oh, a fairly mild sedative, and gave her a hypodermic and within fifteen or twenty minutes she was beginning to doze.

"Q. And did she complain of a burning sensation? A. Not while I was there. She told me that she had some tenderness from the gall-bladder, that she had had several attacks like that.

"Q. Well now then, after you had given that treatment then you left? A. I waited about a reasonable length of time, you see I was called in an emergency, not to take the case. I waited a reasonable length of time and she was still quiet, and about that time Mrs. Word came in, and I don't know what happened after that."

We now come to the testimony of witness Word, the admissibility of which is in question.

Mrs. Hal Word, a neighbor and the wife of Dr. Sanford's former pharmacist, was sent for by Mrs. Wentworth and she came to Mrs. Sanford's bedside. When she arrived Dr. Sanford, Dr. Doyne and Mrs. Wentworth were present. At first Mrs. Sanford did not tell Mrs. Word what was the matter with her but Mrs. Word testified that later on, "She said the doctor had given her some poison in some coffee."

We quote from the record:

"Q. At any time—or when you came in there that morning, did you talk to Mrs. Sanford? A. Yes, I talked to her some; not much, though. She was pretty sick and she didn't talk much, but she talked some.

"Q. What conversation did you have with Mrs. Sanford at that time? A. Well, I think the first thing—

"Mr. Blattman: Just a minute. (Here a conference of counsel was had at the Judge's desk, out of hearing of the Jury, after which the following proceedings were had:)

"Q. Mrs. Word, what was said by Mrs. Sanford as to the cause of her illness, and what was the cause of her illness and what was the matter with her?

"Mr. Blattman: To which the Defendant objects, for the reason it is immaterial, calls for hearsay testimony, and not a part of the res gestae or a declaration of any kind, and the proper foundation to make it admissible has not been laid.

"The Court: The objection is overruled.

"Mr. Blattman: And not made in the presence of the Defendant.

The Court: All right, the same ruling.

"Mr. Blattman: Note our exception.

"Mr. Noble: Now—

"Q. You may answer the same question, do you remember the question, Mrs. Word? A. No.

"Mr. Noble: Read the question, Mr. Reporter.

"Q. (re-read by the Reporter) Mrs. Word, what was said by Mrs. Sanford as to the cause of her illness and what was the cause of her illness, what was the matter with her? A. Well—

"The Court (interrupting): A little louder.

"A. she didn't tell me at first, when I first went in there, what was the matter with her; that was later on.

"Q. What did she say? A. She said the Doctor had given her some poison in some coffee."

Appellant claims, under point two of his brief, that the testimony of Mrs. Word was admitted over objection that the same was hearsay, not part of the res gestae, and no foundation had been laid entitling the same to be admitted as an exception to the hearsay rule and was therefore error.

Appellant in his brief cites the case of Campbell v. Brown, 81 Kan. 480, 106 P. 37, 26 L.R.A.,N.S., 1142 and also the case of Bradberry v. State, 22 Tex.App. 273, 2 S.W. 592, 593, as the law governing the proper test to be applied to testimony to determine its admissibility under the res gestae rule.

From the Texas case we quote: "Were the statements res gestæ? There are no limits of time within which the res gestæ can be arbitrarily confined. They vary, in fact, with each particular case. * * *

The distinguishing feature of declarations of this class is that they should be the necessary incidents of the litigated act,—necessary in this sense: That they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actors. They need not be coincident as to time, if they are generated by an excited feeling which extends, without break or let, down from the moment of the event they illustrate. In other words, they must stand in immediate causal relation to the act, and become part, either of the action immediately producing it, or of action which it immediately produces.' Whart.Crim.Ev. (8th Ed.) §§ 262, 263. 'The test is, were the declarations the facts talking through the party, or the party's talk about the facts? Instinctiveness is the requisite; and when this obtains, the declarations are admissible.' Id. § 691." Bradberry v. State, 22 Tex.App. 273, 2 S.W. 592, at page 593.

If the statements of Mrs. Sanford as related by Mrs. Word were admissible in evidence, they have to be admitted either as res gestae, or as dying declarations. Failing to come within one or the other of such exceptions to the hearsay rule, the court erred.

Appellant relies largely on the case of Territory v. Armijo, 7 N.M. 428, 37 P. 1113, 1115. In that case the defendant was charged and convicted of the murder of his wife by choking and strangling her. A certain declaration made by the wife that her husband had beaten her, was made to her brother twelve hours before her death. The trial court held this declaration to be admissible as part of the res gestae but our Territorial Supreme Court held the contrary.

In the Armijo case the court said: "It is difficult to see how the fact of the wife being beaten early in the morning, some 12 hours prior to her death as a result of the strangulation then inflicted, has been shown, anywhere in the case, to have any connection, so as to make it res gestae of the latter transaction. It certainly cannot be considered res gestae unless defendant is at least connected with, or in some way responsible for, that beating. This, the prosecution maintains, was shown by the declaration of the deceased made to her brother that 'Mr. Hipolito had beaten her.' It must be determined, then, whether or not this declaration was, in the language of Justice Swayne in Travelers' Insurance Co. v. Mosley, 8 Wall. 397 [19 L.Ed. 437], made 'almost contemporaneously with' or 'immediately after' the beating. An investigation of the testimony sheds no light upon the exact time of the occurrence of the beating. It does appear that the deceased was alone at her home; that she saw her brother from her door, where she was standing; that she 'commenced to cry;' and that he asked her what was the matter. The beating may have occurred 10 minutes before, an hour before, and, for aught that appears to the contrary, even the night before. It was the narration of a past occurrence. It was not a spontane-

ous or involuntary utterance, in any sense of the word, but was drawn out by questions, and the fact of its connection with defendant depended for its proof solely upon that narration. The basis for its admission seems to lack every element necessary to give it the character of res gestae." Territory v. Armijo, 7 N.M. 428, at pages 436 and 437, 37 P. 1113.

In addition to the case of Territory v. Armijo, supra, there are three other New Mexico cases in which declarations made subsequent to the criminal act, are involved, they are: State v. Ellison, 19 N.M. 428, 144 P. 10; State v. Stewart, 34 N.M. 65, 277 P. 22; State v. Buck, 33 N.M. 334, 266 P. 917.

■ Declarations to be admissible under the res gestae rule must be such as are closely connected with the criminal act itself. They are admissible as an exception to the hearsay rule because of their spontaneous or instinctive character, and, therefore, credible and admissible in evidence to prove the fact contained in them.

In the case of State v. Stewart, supra, a motion was made to strike the declaration of the deceased on the ground that cross-examination of the witness developed that it was made some ten or fifteen minutes after the injury. We held that "time alone is not the determining factor as to the admissibility of such evidence." [34 N.M. 65, 277 P. 25.]

■ Testing the instant case by the yardstick enunciated in the case of Territory v. Armijo, supra, we find that Mrs. Sanford had been treated by a doctor; had been given a sedative and hypodermic and had gone to sleep. Her respiration and pulse were normal, and that a period of approximately three to three and one-half hours had elapsed from the time of the administering of the poison and her conversation with Mrs. Word. Although time alone may not be the determining factor as to the admissibility of such evidence, yet in the instant case, we can and do consider the element of time, which coupled with other elements, determines whether the declarations are a part of the criminal act and are therefore admissible.

In the case of State v. Buck, supra, the wife of defendant had run two miles from the place at which she was beaten by her husband, after which she related what occurred, and it was held to be res gestae. The principle applicable was stated by this court in that case in the following words [33 N.M. 334, 266 P. 918]: "The particular principle involved here is that an utterance made impulsively and under the strain and immediate influence of an exciting or terrifying occurrence may be so inherently truthful that the ordinary sanctions and tests may be dispensed with. It is a sound doctrine, and one easily grasped. The difficulty is in its application. What are the tests of spontaneity?"

We then discussed, following the above quotation, the general rule with respect to what the tests of spontaneity are, as ex-

pressed by Wigmore, Jones and Wharton in their works on evidence.

■■ The determination of whether or not the particular testimony is admissible must depend upon the particular circumstances of each case. Declarations which are spontaneously and instinctively made are considered by the courts as part of the res gestae. We find no such spontaneous situation here. Mrs. Sanford, under the ministrations of Dr. Doyne, was relaxed and dozing. She did not as at first sight of a close friend following her tragic experience give impulsive utterance to the questioned declaration. Her utterances were not spontaneous exclamations forming a part of and interwoven with the criminal act. They were not made under the immediate strain and influence of an exciting or terrifying occurrence. We cannot sustain the admission of such hearsay testimony under the conditions disclosed by the record in this case without stretching the res gestae rule beyond recognition.

■. A good comparison can here be drawn as to the admissibility of the testimony of Mrs. Word with that of Mrs. Wentworth, which we hold was admissible. The first declarations to Mrs. Wentworth were made after the awful shock and realization that she had just been poisoned and that the poison was taking effect. The first declaration to Mrs. Wentworth, interspersed with repeated declarations as to her suffering, was as to the fact that it would not be long before she died. These declarations were made by an excited woman, cognizant of the terrible thing that was happening to her, and a part of the criminal act itself.

As to the declarations made to Mrs. Word later in the same day, we have an entirely different situation. Mrs. Word came in about 9 o'clock in the morning. Although according to Mrs. Word, Mrs. Sanford was still vomiting and she was "pretty sick", yet there was lacking any of the elements to make such declarations become a part of the fatal act and forming a part of the same transaction.

Having demonstrated that the declaration does not meet the requirements of admissibility under the res gestae rule, let us see if it is admissible as a dying declaration.

The cases in New Mexico discussing the admissibility of dying declarations or the circumstances under which they may be admissible are: Territory v. Eagle, 15 N.M. 609, 110 P. 862, 30 L.R.A.,N.S., 391, Ann. Cas.1912C, 81; State v. McGhee, 23 N.M. 652, 170 P. 739; State v. Kidd, 24 N.M. 572, 175 P. 772; State v. Stewart, 30 N.M. 227, 231 P. 692.

■ In the case of Territory v. Eagle, supra, it was held that where the sense of impending death may be inferred from the terrible character of the wound and the state of illness of the declarant, his statements, made under such circumstances, relative to the homicide, are properly admitted as dying declarations.

■ In the case of State v. McGhee, supra, it was held that proof of dying declarations are admissible, if proper foundation

is laid, although there is sufficient other evidence to prove the fact attempted to be proved by the dying declaration.

In the case of State v. Kidd, supra, it was stated that the foundation for the introduction of the dying declaration was made. One hour after an operation, deceased expressed belief in his imminent and impending death, and, although the court said [24 N.M. 572, 175 P. 778] "It is to be conceded that the foundation for the introduction of the dying declaration was rather meager in character and detail", the admission of the dying statement was sustained.

In the case of State v. Stewart, supra, it was held error to admit a dying declaration on the grounds that there was not sufficient evidence to show that the deceased was at the time aware of his approaching decease. See State v. Stewart, 34 N.M. 65, 277 P. 22, after the retrial.

■ All of the above cases state the general rule that the declarant must be of the settled belief that he is going to die and that he is going to die shortly.

We held in the case of Territory v. Eagle, supra, as follows: "Such declarations are not admissible unless they appear to have been made under a sense of certain and impending death. It is not what the court, which passes upon their admissibility, may believe the character of the deceased was; for, although it may appear to the court, or to any one capable of thinking rationally, that there was no possible hope of recovery, yet the question, aside from that is, what was the state of the declarant's mind, when the declarations were made, did he appreciate the fatal character of his injury, and were his declarations uttered under the sense and solemnities of impending dissolution." Territory v. Eagle, 15 N.M. 609, at page 614, 110 P. 862, at page 863, 30 L.R.A., N.S., 391, Ann.Cas.1912C, 81.

■ The record is silent as to the state of mind of Mrs. Sanford at the time Mrs. Word was present. The record indicates that physically Mrs. Sanford was calm, relaxed, and dozing after the ministrations of Dr. Doyne. Nothing in the record indicates that Mrs. Sanford at that time believed she was facing her maker or believed that she was about to depart from this world.

■ We might with profit at this point compare Mrs. Sanford's state of mind at the time she made the declarations to Mrs. Wentworth and her state of mind at the time she made her declarations to Mrs. Word. The record speaks for itself. One was made at a time when Mrs. Sanford believes she was dying, while the other is devoid of anything indicating such state of mind. She did not speak to Mrs. Word " * * * with the consciousness of a swift and certain doom." Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 24, 78 L.Ed. 196.

■ Counsel for the State argue that this testimony of Mrs. Word is admissible under the dying declaration rule because there is nothing in the record to indicate or suggest a change of condition or belief on the part of Mrs. Sanford that she was dying

since the declarations made shortly before to Mrs. Wentworth. The state argues that Mrs. Sanford believed that she was going to die and that her death was imminent when Mrs. Wentworth was there, and that such belief continued through until the time Mrs. Word came to her bedside. The State cites the case of Mathews v. State, 111 Neb. 593, 197 N.W. 602, 606 as authority. In the Mathews case, the Nebraska court said: "Defendant's objection is not well taken. It is elementary that a dying declaration is admissible in homicide cases, and where a dying declaration has been received in evidence, under circumstances which make it proper to be so received, a subsequent statement may likewise be communicated to the jury without proof that it was made with knowledge of impending death, where it is so closely connected with the dying declaration, in point of time and substance, that it may properly be said to be a continuance thereof."

The declaration made by Mrs. Sanford to Mrs. Word does not indicate a continuance of the same excited state of mind that existed at the time she made the statement to Mrs. Wentworth over three hours before. Much had elapsed between. Dr. Doyne had been called at Mrs. Sanford's request. He had treated her and quieted her. He gave her a glass of anti-acid and bismuth. This stayed down about three minutes and then was expelled from her system. She then seemed relieved. The doctor thereupon administered to her a mild sedative and a hypodermic after which she began to doze. This was at about the time Mrs. Word came

in. We cannot presume that a sense of impending death continued on for more than three hours and during the time she was being attended by a doctor and ultimately was dozing as the result of the doctor's attention.

In the case of Coatney v. State, 61 Fla. 19, 55 So. 285, at page 286, the Supreme Court of Florida said: "The court excluded evidence of a declaration made by the deceased on Sunday before he died, no predicate being laid therefor except the predicate laid for evidence of a declaration made the day before that had been admitted. It was not clearly shown that the deceased was sensible of his impending death, and had no hope of recovery all the while from the time the declaration was made that was admitted to the time the other declaration was made the next day, or until his death; therefore no predicate was laid for admitting evidence of the second declaration, and, under the circumstances, it cannot be presumed that the deceased had no hope of recovery on the day after the injury, or that his sense of impending death on Saturday continued till the next day, when another declaration was made."

The "Presumption of Continuance" rule is not at all applicable to the situation before us.

 In Encyclopedia of Evidence, Vol. 9, Presumptions, page 906, it is said: "8. Presumption of Continuance.—A. Generally.—The general statement is sometimes made that a fact, relation, or state of things once shown to exist is presumed to continue

until the contrary appears.— Such a proposition, however, is not true without regard to the fact involved; it is only those facts or states which are *continuous in their nature* that are legally presumed to continue." (Emphasis ours.) An illustration is given in the note: "The existence of a thing permanent in its character once established is presumed to continue thereafter until the contrary is shown; but the use of land as a pasture is not of such a character. Martyn v. Curtis, 67 Vt. 263, 31 A. 296." And see Page 913, where the principle is applied to "Condition of Mind": "Whether a condition or state of mind once proved to exist is presumed to continue depends upon whether it is continuous in its nature. Thus, insanity of a *permanent character* is presumed to continue until the contrary appears, while temporary insanity or derangement of mind is not presumed to continue at all." (Emphasis ours.) While, of course, fear of impending death does not indicate *temporary insanity,* it is in the nature of things a *temporary condition or state of mind* and by analogy falls within the principles quoted.

 Wigmore, Second Edition, Sec. 1439, on Dying Declaration, says:

"As the guarantee consists in the subjective effect of the approach of death, the declarant should appear to have had a consciousness of the approach of death;

"This consciousness must of course have been *at the time of making the declaration.*

"It follows on the one hand, that a *subsequent change* of this expectation of death, by the recurrence of the hope of life, does not render inadmissible a prior declaration made while the consciousness prevailed, although a repetition of the declaration during the subsequent inadequate state of mind would not be admissible."

To support the last statement, Mr. Wigmore cites Carver v. United States, 160 U. S. 553, 16 S.Ct. 388, 40 L.Ed. 532, and State v. Sadler, 51 La. Ann. 1397, 26 So. 390, 401. State v. Sadler relies on Carver v. United States. The Louisiana Court on rehearing said: "There is nothing whatever to show that the statements made by Miller on the night of January 1, 1898, were made under the sense of impending dissolution. He said nothing at the time to indicate that he believed he was dying, or was about to die, or was going to die. He was awakened from slumber, confronted with the accused, identified them as his assailants, and declared one of them had shot him, and the other was present, assisting by having a pistol in his hand. No foundation for this statement of his as a dying declaration was made, and it was not offered or received as such. The statements of the deceased the preceding night (that of the shooting), December 31st, to Officer Journee, were properly admitted in evidence as dying declarations. A foundation for the same as dying declarations was laid. Miller then stated, in effect, that he believed he was going to die, and, following this, he made the declarations which were offered and received as dying declarations. But this was 24 hours previous to the second inter-

view Journee had with him, and it might well be that at the time of the second interview Miller did not believe he was going to die, and did not say what he then said under the sanctity arising from the sense of impending dissolution. If he did, it should have been established as the basis for the introduction of the evidence; Otherwise, it was not admissible. The case of State v. Diskin, 34 La.Ann. 919 [44 Am. Rep. 448], and that of State v. Robinson, 51 La.Ann. 694, 25 So. 380, are practically identical with this one; and on their authority there must needs be a reversal of the verdict and sentence, and a remanding of the case. The statement made by Miller on the night of the 31st of December, which we think was properly admitted as a dying declaration, was not the same he made on the night of January 1st, which we hold to be inadmissible because not made as a dying declaration. In the first, his statement was that Sadler had shot him, and that Campbell was in his company at the time. In the second, his statement was to the effect (referring to Sadler): 'That is the man, Chapman. Your name is not Sadler, but Chapman. You are the man who shot me;' and referring to Campbell: 'You, Campbell, had a pistol in your hand, also.' The first statement was made outside of the presence of the accused, and the objection to its admissibility was that the proper foundation for it as a dying declaration had not been laid. The second statement was made while the accused were present and under arrest, and was offered and admitted to identify them. It was not a dying dec-

laration. No foundation was laid, or attempted, showing the deceased to have been in the same condition of mind he was when 24 hours before he made what was received as a dying declaration. *There is no presumption that, because a man believes shortly after he is shot that he is going to die as the immediate consequence of his wounds, 24 hours later he continues in this belief.* In Carver v. United States, 160 U.S. 553, 16 S. Ct. 388, [40 L.Ed. 532], the deceased woman, who had been shot and mortally wounded, made two statements. The first was held to have been properly admitted in evidence because it had been satisfactorily established that when the victim made it she was under the impression of almost immediate dissolution. The second was held to have been improperly admitted, because it did not appear whether at the time when the later statement was made she spoke under the admonition of her approaching end. The statements of Miller made at the later interview, if not coming within the category of dying declarations, were hearsay, and should not have been permitted to go to the jury. It was incumbent upon the state to lay the foundation for their admission as dying declarations. Defendants could rely upon the presumption of innocence, and were not compelled to show that the deceased then believed he might recover." (Emphasis ours) The last sentence of the foregoing quotation suggests a consideration of the rule stated by Mr. Lawson in his work on the Law of Presumptive Evidence at Page 240, as follows: "In the case of

conflicting presumptions the presumption of the continuance of things is weaker than the presumption of innocence."

■ An examination of the authorities relating to the rule that the existence of a state of facts or condition once proven to exist continues, is ordinarily invoked in civil cases only. In our opinion, in accordance with the view expressed by Professor Lawson, and also by Judge Blanchard in State v. Sadler, the so-called presumption should be sparingly applied in a case where the life or liberty of an accused is at stake.

The record discloses no proof that Mrs. Sanford was of the same conviction of impending death after she was treated by Dr. Doyne, and had shown improvement, as she was when she first believed that she was poisoned. The state did not show by competent evidence that approximately three hours afterwards Mrs. Sanford in talking to Mrs. Word was rational, conscious of impending death, and speaking with certainty thereof. If at all the second declaration may be taken as disclosing a perseverance in the belief that she had been poisoned, but not as renewing a conviction that she was in the presence of impending death therefrom.

From the syllabus in the case of Jollay v. State, 130 Tenn. 286, 170 S.W. 58, we quote: "Where deceased was anæsthetized shortly after the shooting, and after he recovered from the anæsthetic he was given opiates up to the time of his death, which induced a fitful sleep, the burden is upon the one offering a dying declaration to show that deceased was rational when he made it."

■ The fact that Mrs. Sanford asked Mrs. Wentworth to send for the doctor does not of itself prove that she had hope of recovery, but it is more consistent with hope than despair.

This case is so identical with the Shepard case, supra, that they seem twin cases. In the Shepard case, the crime charged against the defendant was that he poisoned his wife with bichloride of mercury. It was charged that the defendant was in love with another woman, and wished to make her his wife. There was circumstantial evidence to sustain a finding by the jury that to win himself his freedom Dr. Shepard turned to poison and murder. Even so here.

The evidence complained of by Dr. Shepard was offered by the Government in rebuttal when the trial was nearly over. The evidence showed that on May 22, 1929, there was a conversation in the absence of the defendant between Mrs. Shepard, then ill in bed, and Clara Brown, her nurse. The patient asked the nurse to go to the closet in the defendant's room and bring a bottle of whisky that would be found upon a shelf. When the bottle was produced, she said that this was the liquor she had taken just before collapsing. She asked whether enough was left to make a test for the presence of poison, insisting that the smell and taste were strange. And, then she added the words "Dr. Shepard has

poisoned me." We find a strikingly similar situation here.

The conversation was proved twice. After the first proof of it, the government asked to strike it out, being doubtful of its competence, and this request was granted. A little later, however, the offer was renewed, the nurse having then testified to statements by Mrs. Shepard as to the prospect of recovery. "She said she was not going to get well; she was going to die." With the aid of this new evidence, the conversation already summarized was proved a second time. There was a timely challenge of the ruling.

The United States Supreme Court said:

"She said, 'Dr. Shepard has poisoned me.' The admission of this declaration, if erroneous, was more than unsubstantial error. As to that the parties are agreed. The voice of the dead wife was heard in accusation of her husband, and the accusation was accepted as evidence of guilt. If the evidence was incompetent, the verdict may not stand.

"1. Upon the hearing in this court the government finds its main prop in the position that what was said by Mrs. Shepard was admissible as a dying declaration. This is manifestly the theory upon which it was offered and received. The prop, however, is a broken reed. To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death. The record furnishes no proof of that indispensable condition. So, indeed, it was ruled by all the judges of the court below, though the majority held the view that the testimony was competent for quite another purpose, which will be considered later on.

"We have said that the declarant was not shown to have spoken without hope of recovery and in the shadow of impending death. Her illness began on May 20. She was found in a state of collapse, delirious, in pain, the pupils of her eyes dilated, and the retina suffused with blood. The conversation with the nurse occurred two days later. At that time her mind had cleared up, and her speech was rational and orderly. There was as yet no thought by any of her physicians that she was dangerously ill, still less that her case was hopeless. To all seeming she had greatly improved, and was moving forward to recovery. There had been no diagnosis of poison as the cause of her distress. Not till about a week afterwards was there a relapse, accompanied by an infection of the mouth, renewed congestion of the eyes, and later hemorrhages of the bowels. Death followed on June 15.

"Nothing in the condition of the patient on May 22 gives fair support to the conclusion that hope had then been lost. She may have thought she was going to die and have said so to her nurse, but this was consistent with hope, which could not have been put aside without more to quench it. Indeed, a fortnight later, she said to one of her physicians, though her condition was then grave, 'You will get me well, won't you?' Fear or even belief that illness will end in

death will not avail of itself to make a dying declaration. There must be 'a settled hopeless expectation' (Willes, J., in Reg. v. Peel, 2 F. & F. 21, 22 [175 Eng. Reprint, 941]) that death is near at hand, and what is said must have been spoken in the hush of its impending presence. Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L. Ed. 917 [921]; Carver v. United States, 160 U.S. 553, 16 S.Ct. 388, 40 L.Ed. 532; Id., 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602; Rex v. Perry (1909) 2 K.B. 697 [6 B.R.C. 231, 17 Ann.Cas. 285—C.C.A.]; People v. Sarzano, 212 N.Y. 231, 235, 106 N.E. 87; 3 Wigmore on Evidence, §§ 1440, 1441, 1442, collating the decisions. Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. Carver v. United States [160 U.S. 553, 16 S.Ct. 388, 40 L.Ed 532; Id., 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602], supra; Wigmore, Evidence, § 1442. There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered, though the period of survival outruns the bounds of expectation. Wigmore, [Ev.] § 1441. What is decisive is the state of mind. Even so, the state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom.

"What was said by this patient was not spoken in that mood. There was no warning to her in the circumstances that her words would be repeated and accepted as those of a dying wife, charging murder to her husband, and charging it deliberately and solemnly as a fact within her knowledge. To the focus of that responsibility her mind was never brought. She spoke as one ill, giving voice to the beliefs and perhaps the conjectures of the moment. The liquor was to be tested, to see whether her beliefs were sound. She did not speak as one dying, announcing to the survivors a definite conviction, a legacy of knowledge on which the world might act when she had gone." Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, at page 23, 78 L.Ed 196, at pages 199 & 200.

How parallel is the situation before us. Mrs. Sanford speaking to her neighbor, said " * * * the Doctor had given her some poison in some coffee."

Was Mrs. Sanford speaking without hope of recovery and in the shadow of impending death? The record furnishes no proof of that indispensable condition. There was no thought by her physician that her case was hopeless. She was relaxed and dozing. There had been no diagnosis of poison as the cause of her distress.

Nothing in Mrs. Sanford's condition at the time she was talking to Mrs. Word gives fair support to the conclusion that hope had been lost. There must be "a settled hopeless expectation" that death is near at hand, and what is said must have been spoken in the hush of its impending presence. The state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom. The evidence does not support the conclu-

sion that what was said by Mrs. Sanford to Mrs. Word was spoken in· that mood. There was no warning to her in the circumstances that her words would be repeated and accepted as those of a dying wife, charging murder to her husband, and charging it deliberately and solemnly as a fact within her knowledge. To the focus of that responsibility her mind was never brought. "She did not speak as one dying, announcing to the survivors a definitive conviction, a legacy of knowledge on which the world might act when she had gone." Shepard v. United States; supra.

In light of what we have said, it will· be necessary to reverse and remand the·· cause with instructions to grant the appellant a new trial.

It is so ordered.

BICKLEY, C. J., and BRICE, SADLER, and MABRY, JJ., concur.